OLYPHANT and another *v.* ST. LOUIS ORE & STEEL Co. and others.
(LACKAWANNA IRON & COAL Co., Intervenor.)[1]

*(Circuit Court, E. D. Missouri. September 22, 1886.)*

1. RECEIVERS—LIENS—CONTRACTS.
    Where the order of court appointing a receiver of a company directs him to carry out and perform the company's contracts, creditors to whom money is due upon partially performed speculative contracts are not entitled, under such order, to a lien therefor prior to that of mortgage creditors.
2. DEBTOR AND CREDITOR—PAYMENT.
    Where a debtor sent his accepted drafts on a third person to a creditor, with directions to collect them, and apply the proceeds to the payment of the amount due him, and the acceptor made an assignment, and such creditor presented the drafts to the assignee, and obtained an allowance, but collected nothing, *held,* that such action on the creditor's part did not amount to such an appropriation of the acceptances as to release his claim against the original debtor.
3. CONTRACTS—SALES—DAMAGES.
    Where a manufacturer contracts to furnish, at a stipulated time and price, articles which he is engaged in manufacturing, and the other party to the contract refuses to receive such articles when tendered, the measure of damages is the difference between the cost of manufacture and the contract price, and, in the absence of evidence to the contrary, the market value will be taken as the cost of manufacture.

In Equity.
*Edmund T. Allen,* for R. M. Olyphant.
*Hough, Overall & Judson,* for Farmers' Loan & Trust Co.
*Edward Cunningham, Jr.,* for Intervenor.
*Hitchcock, Madill & Finkelnburg,* for Receiver.

BREWER, J., *(orally.)* In the matter of the intervening petition of the Lackawanna Iron & Coal Company in the case of *Olyphant v. St. Louis Ore & Steel Company,* the facts are that the ore and steel company, organized for the manufacture of steel rails as well as for the

[1] Edited by Benj. F. Rex, Esq., of the St. Louis bar.

mining of ore, made some contracts with railroad companies in 1883 for the sale to them of steel rails, deliverable monthly at a fixed price. Instead of itself manufacturing those rails, it turned around and made contracts with other manufacturing companies, among them the Lackawanna Company, for the manufacture by them of rails at a less price than that at which it agreed to sell to the railroad companies. These contracts were partially carried out. Several thousand tons of rails were manufactured by the Lackawanna Company, delivered to the Ore and Steel Company, and by it delivered to the railroad companies.

At the time the receiver was appointed, the value of the rails delivered by the Lackawanna Company was $167,248.12. Of that sum $109,207.79 had been paid; $22,040.33 remained confessedly unpaid; $36,000 had been disposed of, temporarily at least, by the Ore and Steel Company sending their accepted drafts on Cherrie & Co. to the Lackawanna Company, giving assurances that those drafts would be paid by Cherrie & Co., and directing the Lackawanna Company to collect those drafts, and apply the amount on the claim. Those drafts were accepted by Cherrie & Co., but shortly thereafter Cherrie & Co. became insolvent, and an assignee was appointed under the laws of the state of Illinois, in which they did business. The Lackawanna Company presented those acceptances to the assignee, and they were allowed, but nothing has ever been realized upon them. A part of the claim of the Lackawanna Company is for that sum of $36,000. The Ore and Steel Company insists that the action of the Lackawanna Company in presenting these acceptances to Cherrie's assignee, and obtaining an allowance, was equivalent to a personal appropriation of those acceptances, and made them to operate as payment. We think not. They were never taken, in the first instance, as payment. There was no agreement that they should be accepted as payment. They were received under directions to collect whatever could be collected on them, and apply on the debt; and the mere fact that the Lackawanna Company proceeded in good faith to try and collect them of the assignee of Cherrie & Co. did not amount to an appropriation by it of those acceptances so far as to release its claims against the Ore and Steel Company. We think, therefore, the master was right in allowing that amount as a demand against the Ore and Steel Company.

In the petition filed in July by the trustee of one of the mortgages on the Ore and Steel Company, he stated the insolvent condition of the Ore and Steel Company; set forth these contracts; and prayed for the appointment of a receiver, with power to maintain and operate a railroad which belonged to the Ore and Steel Company, to keep the same in proper repair, and to operate the coal and ore mines, and to carry out and perform said contracts for the delivery of coal and ore, and the purchase and sale of steel rails.

In the order of the court appointing the receiver, he was directed

to carry out and perform the contracts of the Ore and Steel Company for the purchase and sale of steel rails, and to preserve and protect all the property of said corporation, and to collect, as far as possible, all accounts, choses in actions, and credits due the said company, acting in all things under the order of this court. Now it is insisted that this claim for unpaid moneys should, by virtue of this order, be given priority over the mortgages upon the Ore and Steel Company. Counsel concede that but for this order such a claim for moneys due would be simply a general claim, and entitled to no priority over secured indebtedness. Indeed, that is very evident; for the claim has none of the equities of a supply claim. It was not for supplies purchased to enable the Ore and Steel Company to carry on its legitimate business of mining or manufacturing; neither was it a contract for betterments. It was really no more than a speculative contract, by which it, instead of mining and manufacturing, went into the market, and bought from one party for the purpose of selling to another. But the argument is this: As the Ore and Steel Company was a defaulter in the payment for rails already manufactured and delivered by the Lackawanna Company, and as there was a single contract extending forward into the future for the delivery of further rails, when the court directed its receiver, on the petition of the trustee of the mortgage, to carry out and perform that contract, it virtually assumed it in its entirety as one made by the court for the benefit of the property in the hands of the receiver. It is said that the Lackawanna Company was under no obligations to deliver any more rails, but could treat the contract as then terminated, and present its claim for the unpaid balance; and that when the court, at the instance of the bondholders, directed the carrying out and fulfillment of the contract, it could not thereby appropriate that which was beneficial, and repudiate that which was burdensome, but took it as an entirety, and cast, therefore, upon the property in the hands of the receiver a lien prior to that of the mortgage.

Neither the language of the petition, nor of the order of the court, in terms expresses any such idea. The petitioner did not ask that this unsecured claim be awarded priority. The court did not direct that it should be given, and, as well suggested by counsel for the receiver, it would be a startling doctrine that the court appointing a receiver, and directing him to take possession of properties, must in that order, or by virtue of that act, wipe out all incomplete contracts and partially fulfilled agreements, at the risk of giving to the past-due general claims of parties holding these incompleted agreements a priority over secured liens. The court takes possession of the property for the benefit of all concerned, and should manage it with that purpose in view; making, even if it has the power, no other changes in the several relations of creditors to each other and to the common debtor than are absolutely necessary for the accomplishment of the main purpose. The interests of all parties oftentimes will be promoted by

going on with contracts partially completed. The intervenor was so benefited in the case at bar. Whatever is done by the receiver, in the performance of these contracts, of course becomes an obligation upon the receivership and its property, to be protected by the court; but to hold that by virtue thereof the court goes back, and takes all obligations already matured which spring from the one contract, and casts them as a lien upon the property prior to that of the secured indebtedness, we do not think ought to be tolerated. Generally the continuance of the business pending the foreclosure of the liens is a main object of the receivership. In that it differs from an assignment, which aims at a cessation of business, and a closing out of the concern. Especially is this true of railroad receiverships; the continuance of the road as a going concern, and the preservation of its established relations and existing contracts, being a large element of value. Can it be that such continuance changes the relations of the secured and unsecured creditors to each other and to the property? And this applies, not only to the claim for moneys due at the time of the appointment of the receiver, but also to the claim for damages by reason of the failure of the receiver to fully complete the contract. Both claims spring out of an unsecured contract; and nothing in the nature of that contract, or in the orders of the court, justify us in giving either claim priority over the secured indebtedness. No such purpose was contemplated; and there are no equities to justify such action. The receiver was directed to carry out these contracts, "acting in all things under the order of this court." So far as any special orders were given, they were obeyed, and all rails received under them paid for.

Finally, a claim for damages for a failure to fully perform the contract was made and allowed by the master. Of this the receiver complains. Under the original contract there were to be some thousands of tons delivered during September, October, November, and December. They were not received,—the railroad company refusing to take them, and the receiver being unable to dispose of them; and the Lackawanna Company claims damages from the Ore and Steel Company for the non-fulfillment of that part of the contract. The master finds that the market value of rails of the kind stipulated for in the contract during that fall season was $30. The contract price was $35. The master therefore gave the Lackawanna Company an allowance for its damages, based upon that difference,—a sum amounting to $23,001. The receiver contends that that was improper; that the measure of damages would be the difference between the cost to the Lackawanna Company of constructing the rails and the contract price; and that, as there was no testimony before him as to what the cost of construction would in fact have been, there is no basis for an assessment of damages.

The master finds, and the testimony shows, that there was a market value to rails of this description, and that the market value was $30.

We think that that is sufficient basis for the assessment of damages; that *prima facie* that is the cost of construction; that, if there were any peculiarities in the surroundings and conditions of the Lackawanna Company which would make its construction and manufacture of those rails more expensive, that was a matter for the receiver to show in abatement of the damages; as, on the other hand, the Lackawanna Company could have shown, if the facts would justify, that it could have constructed those rails at $28,—a price less than the market value,—and then the measure of damages would have been the difference between $28 and $35. In the absence of any testimony as to the actual cost of construction by the Lackawanna Company, the market value of the rails, it being shown that they had a market value, is a sufficient basis for the assessment of damages. So we think the assessment was correctly made by the master.

Those are the three questions presented; and, as we agree with the master, the exceptions will be overruled, and the report confirmed.