### RIVER SPINNING CO. v. ATLANTIC MILLS.

#### (Circuit Court, D. Rhode Island. March 25, 1907.)

#### No. 2,741.

1. SALES—BREACH OF CONTRACT BY PURCHASER—REMEDY OF SELLER.

The price of goods contracted to be sold and delivered, but which have not been delivered nor accepted so as to pass title to the buyer, cannot be recovered under a count in assumpsit for goods bargained and sold, the only remedy of the seller being an action for damages for breach of the contract, and the rule is the same whether the contract is one to sell merely or to manufacture and sell, in the absence in the latter case of the assent of the buyer to an appropriation on the contract of goods manufactured by the seller, or unless they are of such peculiar character as not to be marketable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 958, 960.]

2. SAME—CONSTRUCTION OF CONTRACT.

A written contract to sell a specified quantity of yarn of a stated quality, at a stated price, to be delivered in smaller quantities at intervals, is not one to manufacture and sell, but an executory contract to sell only, although the seller owned and operated a mill for making yarn, and it was contemplated by the parties that the yarn should be spun at such mill, since it was not bound to so make it.

[Ed. Note.—Contracts for sale of things to be produced or manufactured, see note to Star Brewing Co. v. Horst, 58 C. C. A. 363.]

3. SAME—MEASURE OF DAMAGES FOR BREACH.

Where a purchaser refuses to take goods bought which the seller has not on hand, but is to manufacture or purchase, the measure of his damages recoverable for breach of the contract is not the difference between the contract price and the market price of the goods at the time of the breach, but the actual profit he would have made on the sale.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 1106.]

4. SAME.

A company operating mills for making yarn which contracted to furnish to a buyer a quantity of yarn to be delivered as required in the future, after the completion of a contract then existing between the parties, on the refusal of the buyer to order or accept any further deliveries under the contract, *held* not entitled to recover as damages for its breach a loss resulting from a resale of wool which it bought some two years before it was required and reserved for use in filling the contract, although it was suitable for use on other contracts; such an element of damages apparently not being within the contemplation of the parties when the contract was made.

At Law.

Walter F. Angell, Frank H. Swan, and Edwards & Angell, for plaintiff.

Rathbone Gardner, Wm. H. Thornley, Gardner, Pirce & Thornley, John W. Boothby, and Boothby & Baldwin, for defendant.

BROWN, District Judge. This is an action of assumpsit by the River Spinning Company, a Rhode Island corporation, against the Atlantic Mills, a corporation organized under the laws of Maine, and was begun by attachment of real property by writ issued by the state court. Upon removal a jury trial was waived, and the case heard by the court on oral testimony and documentary proofs.

The declaration contains two special counts, also a count for goods bargained and sold, and other common counts.

Findings of Fact.

I find the facts as follows:

The following letters passed between the plaintiff and the defendant:

"Providence, R. I., March 20th, 1900.

"Mr. Andrew Adie, Agent,
    "River Spinning Co., Woonsocket, R. I.

"Dear Sir: I beg to confirm the conversation over the 'phone to-day, and understand that you have sold us 250,000 pounds of what we call the regular 6½ run woolen yarn, at 81½¢ a pound. Also 250,000 pounds of special 6½ run, at 83½¢. This yarn to follow along after the present contracts with you are filled.

"It was not mentioned to-day, as a part of the conversation, but as nearly as I can remember the conversation, previous to your illness and mine, we were to have at the beginning of this contract (if you increased the capacity of your machinery at that time) deliveries of some 6,000/7,000 lbs. per week more, than we are now receiving. In other words, after your new machinery was in, and installed.

"It is also understood to be a part of this contract, that the Atlantic Mills deliver to you 250,000 lbs. of Noils, either 'X.X.' or 'X.X.X.' Z or P Noils, as they may be making from time to time, at 2¢ per pound less, than the contract price for this year, made with Mess. Asa Peck & Co. Will you, at your early convenience, please confirm the above.

    "Yours very truly,                    Atlantic Mills,
                                "Chas. D. Owen, Agent."

"Woonsocket, R. I., U. S. A., March 30th, 1900.
"Atlantic Mills,
      "C. D. Owen Esq., Agt.,
            "Providence, R. I.
      "Dear Sir: We beg to confirm your esteemed favor of the 20th inst. accepting our offer of 250,000 lbs. 6½-Run Filling Regular, at 81½¢., also 250,-000 lbs. 6½-Run Special at 83½¢.
      "The above to follow present Contracts. It is also understood to be a part of this Contract that you deliver to us 250,000 lbs. of Noils, XX or XXX Z & P at 33¢. and 45¢. respectively.
      "We cannot yet determine what additional deliveries we can make with our increased capacity, but we fully expect to be able to give you 6,000 lbs. per week more, in other words, ¾ of our whole product.
      "We trust this will be satisfactory, and esteeming your favors,
      "Yours very truly,                    River Spinning Co.,
                                          "Andrew Adie, Agent."

March 22, 1900, the plaintiff bought 221,036 pounds of wool at the cost of $82,869.53. This was bought at a fair price at that date, and was suitable material for the manufacture of the yarn. The price, by mutual agreement, was subsequently reduced to 76½ cents per pound for regular yarn, and 78½ cents per pound for special yarn, and the price of noils was also reduced. The plaintiff delivered, and the defendant accepted and paid for, all the special yarn; and the defendant delivered, and plaintiff paid for, the noils. The present controversy relates to the lot of yarn which we may designate as 250,000 pounds of regular 6½ run woolen yarn. It was understood by both plaintiff and defendant that the yarn had not been manufactured, but was to be manufactured by the plaintiff, and that spinning instructions were to be given by defendant to plaintiff. Referring to the provisions, "this yarn to follow along after the present contracts with you are filled," and "the above to follow present contracts," I find that, though deliveries of special yarn were begun prior to the completion of contracts existing March 30, 1900, deliveries on previous contracts were not completed before September 24, 1902, and that the defendant was not in default up to this date.

I find that from and after September 24, 1902, and until the date of the plaintiff's writ, March 29, 1904, the plaintiff was willing and ready and able in all respects to make deliveries at the rate of 24,000 pounds per week if the defendant had given spinning directions, or had so requested, and that the plaintiff repeatedly urged that spinning instructions be sent. On October 21, 1902, the plaintiff by letter informed the defendant that the plaintiff had been obliged to carry wool for the completion of the contract for a long period of time, and on November 24, 1902, the plaintiff sent the defendant samples of such wool.

I find that the rate of deliveries of yarn was not expressly agreed upon, but that the defendant, from and after September 24, 1902, was bound to take deliveries at reasonable rates. In considering what was a reasonable rate, I find that at the time of the contract the parties had in contemplation rates of delivery exceeding 18,000 pounds of yarn per week. The rate of deliveries upon the previous contract of November 18, 1899, I find not a proper or reasonable rate for deliveries under this contract. While there is doubt whether, by the terms of the contract of November 18, 1899, the defendant was to have an option

merely as to the kind of yarn, or an option as to the dates and quantities of deliveries, the parties apparently treated said contract as if the latter were the true construction. This, however, is insufficient to import such an option into the present contract. I find that the defendant did not, by the terms of the present contract, have an unlimited option as to the time of deliveries, but was bound to take at reasonable rates, and that the plaintiff was ready and willing to make such reasonable deliveries that, if the defendant had called for or accepted them, the contract would have been fully performed long before September 12, 1903, the date claimed in the plaintiff's bill of particulars.

At the date of the plaintiff's writ, March 29, 1904, the defendant had received and paid for 23,352 pounds of regular yarn, leaving undelivered at this date 226,648 pounds of yarn. Of this the plaintiff had manufactured 43,885 pounds in anticipation of spinning instructions from the defendant. I find that the plaintiff, in proceeding to manufacture said yarn, acted in reasonable reliance upon the defendant's original agreement to accept and pay for the same. About the early part of July, 1903, defendant's agent, Mr. Owen, was informed that the plaintiff's agent was anxious to get delivery directions for yarn that was manufacturing at plaintiff's mill, and which plaintiff's agent said plaintiff was "compelled to put into our stock awaiting his orders." Mr. Owen said that plaintiff was manufacturing yarn for him now against said contract (of March, 1900) at great risk. I find no evidence as to the plaintiff's disposition of the yarn that it manufactured, save that it put the same into stock awaiting orders. I find no evidence of any act of appropriation of any specific yarn by the plaintiff to the defendant, and I find no evidence that the title to the yarn manufactured by the plaintiff ever became vested in the defendant prior to the date of the writ. I find no evidence that the defendant at any time assented in any way to taking title to yarn save upon specific orders for specific deliveries, and I find that no specific order was given for any of the yarn in plaintiff's hands at the date of the writ. After the beginning of the present suit the defendant received and paid for 10,687 pounds of yarn, leaving in the plaintiff's hands 33,198 pounds of yarn for which it claims the contract price.

The continuous failure of the defendant to give spinning instructions, or to accept and receive reasonable amounts of yarn, was without justification, and excused the plaintiff from manufacturing more yarn than it did manufacture, and constituted a complete breach of the contract by the defendant prior to the date of the plaintiff's writ. The question whether the defendant, in explicit terms, made a refusal to accept more goods, I regard as immaterial, since the plaintiff's right to recover rests upon a breach of the contract already past at the date of the writ, and not upon an anticipatory breach, or upon an express declaration by the defendant that it would not complete its contract.

I find that 221,036 pounds of wool in plaintiff's hands at the date of the writ was more wool than was required to manufacture the 182,176 pounds of undelivered yarn not manufactured. I find that 100 pounds of wool will manufacture 110 pounds of yarn, and that the yarn in question was to contain 12 per cent. of material other than this wool, to wit, 12 per cent. of noils. The sale of wool by the plain-

tiff on April 6, 1904, was fairly conducted, but more wool was sold than was carried for the completion of the contract. The plaintiff has offered no evidence as to the market value of yarn or of wool at the time of the defendant's breach or at the date of plaintiff's writ. I am, therefore, unable to determine the market value of yarn at any time, or the market value of the wool at any time other than at the date of the original purchase, March 22, 1900, and at or about the date of sale, April 6, 1904. At this date, which was after the date of the writ, the plaintiff sold 219,830 pounds of wool for the price of $58,740.13.

I find that the wool purchased March 22, 1900, was not special material, but material suitable for use in plaintiff's general business; that the plaintiff, in manufacturing 250,000 pounds of special yarn, might have used 83,333 pounds of said wool, and in the manufacture of 67,236 pounds of regular yarn might have used a considerable amount in addition, had it so chosen. The plaintiff used none of this lot of wool upon this contract, and in using other wool did not consult the defendant. I do not find that the defendant in any way assented to the purchase, appropriation, or holding of any of this wool by the plaintiff for the performance of this contract. I find that, had the contract been performed by the defendant, the plaintiff would have made a profit of 7½ cents per pound on yarn. I find also all such facts not above included as may be referred to or made the basis of the following conclusions of law.

The defendant has appended to its brief certain requests for findings. These seem to involve mixed law and facts; but, as it may facilitate a final disposition of the case, I will pass upon said requests as framed. The first six requests are each and all denied. The seventh request is in part granted, and the eighth and ninth requests are granted, as will be seen from the following conclusions of law.

In the view that I take of the case, more specific findings of fact seem unnecessary; but, in case either party shall desire a more specific finding of facts, a request therefor may be filed within 30 days from the date of these findings.

### Conclusions of Law.

The conclusions of law may best be stated in connection with the plaintiff's specific claims for damages.

The plaintiff claims:

(1) The contract price of 33,198 pounds of yarn manufactured and still in plaintiff's hands.

To support this item, plaintiff relies upon the count for goods bargained and sold. This count cannot support the pliantiff's claim for the contract price, for the reason that the title to the yarn did not pass to the defendant. Under such circumstances, the plaintiff's remedy is only damages for nonperformance of the contract. The rule is stated in 1 Chitty on Pldg. (11th Am. Ed.) *347, *348:

"If there have been no delivery of the goods, even the count for goods bargained and sold (not showing a delivery) cannot be maintained, unless it appear that there has been a complete sale and the property in the goods had become vested in the defendant by virtue of such sale, and an actual accept-

ance of the commodity by the defendant. * * * Nor is the property in goods vested in the defendant so as to render the common count for goods bargained and sold sufficient, unless the article has been finished, and specifically appropriated and set apart for the purchaser, and he has assented thereto."

In Benjamin on Sales (5th Eng. Ed.) 816, 817, it is said:

"It may be stated generally that the seller may recover the price of goods sold either where the goods have been sold and delivered to the buyer, or where they have been only bargained and sold to him. [The latter form of action is applicable where the property has passed, and the contract has been completed in all respects except delivery, and delivery is not part of the consideration for the payment of the price, or a condition precedent to its payment, as where payment is by agreement to be made irrespective of delivery, or where the condition of delivery has been waived by the buyer's refusal to take or receive delivery, or has been excused by the perishing of the goods which are at the risk of the buyer. * * *] Where the property has not passed, the seller's claim must [as a general rule] be special for damages for nonacceptance."

See, also, Benjamin on Sales, pp. 805, 812.

The plaintiff requests a ruling upon the following question: Was the contract between the parties one of manufacture and sale?

I am of the opinion that the contract was an executory contract for the sale of a specified quantity of yarn. Though I find that it was fully understood and contemplated by both parties that the yarn was to be spun at the plaintiff's mill, the terms of the written contract did not impose upon the plaintiff the obligation to spin this yarn, and its obligation would have been fully performed by the tender of yarn of like quality spun at other mills.

It does not seem practically important, however, whether this contract be regarded as an agreement to manufacture and sell, or as an agreement which did not bind the plaintiff to manufacture, but only to sell.

"When the seller is to manufacture the goods for the buyer, the rule is that prima facie the property will not pass till the goods are completely made and are appropriated with mutual assent." Benjamin on Sales (5th Eng. Ed.) 358.

According to what seems the better authority, the action for the contract price cannot be maintained even where the goods are manufactured according to the contract, in the absence of the defendant's assent to an appropriation of the goods. Tufts v. Bennett, 163 Mass. 398, 40 N. E. 172; Atkinson v. Bell, 8 B. & C. 277; Moody v. Brown, 34 Me. 107, 56 Am. Dec. 640; Tufts v. Grewer, 83 Me. 407, 22 Atl. 382; Sutherland on Damages, §§ 647–649, p. 1875; Harvard Law Review, March, 1907, p. 363; Kingman & Co. v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489; 24 Am. & Eng. Enc. Law, pp. 1063, 1118.

Bookwalter v. Clark (C. C.) 10 Fed. 793, on which the plaintiff relies, is of the class of cases which relate to goods manufactured according to a certain measure, pattern, or style, and of such peculiar character that there is presumably no market for them. There is authority for the proposition that in this class of cases an action lies for the contract price despite the defendant's refusal to take the

goods, and notwithstanding that he has given no assent to receiving title other than that implied in his ordering goods; but even these cases do not support the broad proposition that, because goods are ordered to be manufactured, the maker may recover the contract price upon a refusal to receive them.

There is no general presumption that, because goods are to be manufactured, they are not of a marketable character. The fact that the 6½ run regular yarn was to be made to order would be entirely insufficient to raise a presumption that it was not marketable. Such evidence as there is in this case on the subject indicates that, as a matter of fact, yarn of the character in question is a staple for which there is a regular market.

The reasoning in Bookwalter v. Clark (C. C.) 10 Fed. 793, is inapplicable to goods of a marketable character, and it is specially inapplicable where the seller might have fulfilled his obligation by tendering goods made by other manufacturers.

If there are exceptions to the general rule that title does not pass without the buyer's assent to the appropriation of the goods, this case, upon the facts as I find them, is not within such exceptions. The measure of damages as to the lot of yarn manufactured and still in the plaintiff's hands should be the difference between the contract price and the value of the yarn in plaintiff's hands. As there is no evidence tending to show the latter item, it is impossible to estimate plaintiff's damages in respect to this item, or even to know whether it has suffered damage. At best, only nominal damages can be given for this item.

(2) Damages for failure to take 182,176 pounds of yarn which plaintiff did not manufacture.

I find the plaintiff entitled to recover as damages: (A) The profit which it would have made by the completion of the contract, to be figured by deducting from the contract price the amount which it would have cost the plaintiff to produce the same at its mills.

The proper rule of damages in this case I find to be that stated in United States v. Behan, 110 U. S. 338, 344, 345, 346, 4 Sup. Ct. 81, 83 (28 L. Ed. 168):

"The prima facie measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely, first, what he has already expended towards performance (less the value of materials on hand); secondly, the profits that he would realize by performing the whole contract.

"It does not lie, however, in the mouth of the party who has voluntarily and wrongfully put an end to the contract to say that the party injured has not been damaged at least to the amount of what he has been induced fairly and in good faith to lay out and expend (including his own services), after making allowance for the value of the materials on hand. At least, it does not lie in the mouth of the party in fault to say this, unless he can show that the expenses of the party injured have been extravagant, and unnecessary for the purpose of carrying out the contract."

See, also, Kingman v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489; Horst v. Roehm (C. C.) 84 Fed. 565; Roehm v. Horst, 91

Fed. 345, 33 C. C. A. 550; Kohn v. Dravis, 94 Fed. 288, 290, 36 C. C. A. 253.

The defendant contends that this rule of damages is inapplicable to the present case, for the reason that the contract was an executory agreement for the sale and future delivery of a staple article of commerce, and that the measure of damages for such an agreement is the difference between the contract price and the market price at the time of the breach.

While this is a just rule to determine a loss of profit on goods ready for delivery at the time of the breach, as was pointed out in Kingman v. Western Mfg. Co., 92 Fed. 486, 490, 34 C. C. A. 489, it is not the true rule as to goods not then made and ready for delivery. It is a just rule for the buyer in a suit by him, because on the breach, having the money in hand, he may procure the goods on the market, and charge the seller with the difference. But to measure the damages of a seller who has not the goods on hand by the difference between the contract price and the market price is often impractical, and would often be unjust. It would be equally unjust in a case where the seller was to make the goods himself, and in a case where he was to procure the goods from other manufacturers or jobbers. If the vendor can make his goods for less than the market price, he is entitled to his actual profit. If his goods are to be bought, or to be made for him by other contractors above the market price, then his profit would be smaller than the difference between the contract price and the market price. Only if the cost of production and the market price at the breach were the same would the rule be just, and this is practically to say that the rule would seldom be a just mode of determining the loss of profits.

That there is in a suit by the seller no proper basis for a distinction between goods which he is to manufacture (whether bound to manufacture or not), and goods which he is to buy, instead of to manufacture, is apparent from the reasoning of the Supreme Court in Roehm v. Horst, 178 U. S. 1, 21, 20 Sup. Ct. 780, 788 (44 L. Ed. 953), where it is said:

"If the vendor has to buy instead of to manufacture, the same principle prevails," etc.

In figuring what profit the seller has lost, he should be charged with all expenditures which he would have been to for getting the goods in hand for delivery to the buyer, whether he was to make them himself (voluntarily, or under obligation to do so), have them made by other manufacturers, or was to buy them ready made. It is enough to show what would have been the seller's cost of acquiring the goods. The mode of acquisition is irrelevant to the rule that, in order to compensate the seller, the buyer who has chosen to break a contract should pay the seller the profit he would otherwise have made. From the decisions of the Supreme Court above cited, it appears that the principles of compensation are not peculiar to cases where the seller agrees to manufacture, as well as to sell. Furthermore, the seller relies upon obtaining the contract price because it includes his reimbursement as well as his profit. If he has the goods, he can reimburse himself by sell-

ing them. He cannot reimburse himself by selling what has never come into existence or into his hands; and the fact that he is justly excused from making or getting the goods leaves him with no recourse but the buyer for reimbursement for expense and for compensation for loss of profit. The rule for which the defendant contends not only fails to give compensation to the seller for his actual loss of profit, but fails absolutely to recognize the duty of the buyer to reimburse the seller for expenditures.

I am of the opinion that the plaintiff is entitled to recover as its loss of profit the sum of $13,717.19, being 7½ cents per pound upon 182,-768½ pounds of yarn not manufactured.

(B) Plaintiff's loss on wool.

The plaintiff claims as damages its loss on a resale of wool which it claims was left on its hands as a consequence of the defendant's breach of contract. The facts, however, do not present the simple case of a purchase of materials which the plaintiff could use only for the unperformed part of the contract.

. The wool was purchased in advance of the need for it. The plaintiff could have procured the wool at any time it saw fit, and in buying consulted its own views as to the market. The wool was of a kind suitable for use on other contracts, and could have been used on other contracts had the plaintiff so chosen. It was held by the plaintiff for two years and a half before it was, in fact, needed for manufacture. This reservation of wool for so long a time does not appear to have been contemplated by either party in March, 1900, the time of the contract.

It also appears that during this period the plaintiff had the opportunity, had it so chosen, to have used 83,333 pounds in the manufacture of the special yarn. It elected not to do so, and used other wool for this purpose. It also chose to use in manufacturing for the deliveries of regular yarn other wool than that on hand. If, when manufacturing 67,236 pounds of the regular yarn, it chose to purchase or to use other wool, it exercised its own judgment at a time more than two years after the original contract. If it preferred to reserve this wool for the later and final deliveries rather than to use it for the earlier deliveries, such a choice could hardly have been made without regard to the plaintiff's speculations or opinions as to the wool market. The appropriation of this wool (if it was appropriated) to the final and more remote deliveries was an act of independent judgment. To do this increased carrying charges, and any act of the deferring of the use of this wool for the contract, was an expense not chargeable to the defendant.

That the plaintiff had on hand so large a quantity of wool at the time of the breach, or at the date of its writ, seems to have been due to several reasons—to its purchase of wool in advance of the need for immediate use to fill defendant's orders; to its judgment that, in view of the condition of the market, it was advisable to do so; to its election not to use any part of the wool for the special yarn or on other orders; to its election not to use any part of the wool for its deliveries of regular yarn, or for the yarn manufactured for delivery; to its reservation of the wool for the later and more remote deliveries.

In all these acts of independent judgment, opinions as to the market

were doubtless a factor. It is true that the plaintiff had incurred a fixed charge for a certain quantity of wool; but, when it did so, it had the option of using the wool either for this or other orders for yarn. There was no specific act appropriating the wool to this contract. It is hardly probable that material suitable for use in its regular business would have been reserved during a period of more than two years. unless during that time the condition of the wool market enabled the plaintiff to get wool at a price cheaper than the price it had paid for the wool on hand. So far as the plaintiff went in this contract, it used other wool; and, so far as can be known, had the plaintiff manufactured the remaining 182,176 pounds of yarn, other wool might still have been used, and the present lot still have remained in plaintiff's hands.

The plaintiff contends that this wool was bought to cover this contract, but this means little more than that the plaintiff, in view of what wool it had on hand and of this contract, and doubtless of other contracts, thought it advisable on March 22, 1900, to buy additional wool in anticipation of or as a precaution against a higher market. Can it be said that this defendant is in any proper sense responsible for the fact that the plaintiff not only bought at a high market, but that it reserved the wool for four years and unloaded it on a low market? It must not be overlooked that this material was not special material adapted for use only on this contract. It was such material as was ordinarily used, and as was usable in the plaintiff's ordinary business.

It is probable that the contract was a factor in the plaintiff's judgment that it should buy wool on March 22, 1900; but how important a factor it was in view of other considerations, of other contracts with this defendant and with third persons, or prognostications as to the wool market and as to other orders, it is impossible to say. That it was the sole factor, or even a principal factor, is not apparent. The amount of wool bought does not correspond to the amount required for this contract; and the amount of wool reserved does not correspond with the amount required to complete the contract. There seems to be little more warrant for saying that this lot of wool was appropriated for this contract than for saying that the lot of 349,000 pounds of California wool in the grease at 11½ cents a pound (which apparently was figured by Mr. Adie in estimating the profit) was appropriated for this contract.

So far as the plaintiff bought wool merely to cover its obligations to deliver yarn, as a protection against a change of price of wool as distinguished from the provision of material necessary for the contract, his dealings in wool must probably be regarded merely as a collateral enterprise, for the results of which the defendant is not responsible. But, at all events, the postponement of deliveries of the regular yarn for more than two years and six months seems to break all connection between what was in the contemplation of the parties at the date of the contract and the final outcome. There was also the intervention of independent acts of judgment in reserving the wool when an opportunity arose to use it.

It is well settled that one who breaks his contract is answerable only for such consequences as may reasonably be supposed to be in the contemplation of the parties at the time of making the contract. Globe

Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 23 Sup. Ct. 754, 47 L. Ed. 1171. After a careful consideration of this item of loss, I am of the opinion that it was neither a necessary nor a contemplated consequence of defendant's acts, and is too remote for allowance.

The plaintiff may take judgment for $13,717.19 damages, with interest from September 12, 1903.