## JACKSON v. WASHINGTON, BALTIMORE, & ANNAPOLIS ELECTRIC RAILWAY COMPANY.

TRIAL; ESTOPPEL; CONTRACTS; SALES.

1. A party at whose instance a question was submitted to the jury is estopped, on appeal by the other party, to deny the propriety of such submission. (Following *Capital Traction Co.* v. *Brown,* 29 App. D. C. 473, 12 L.R.A.(N.S.) 831, 10 A. & E. Ann. Cas. 813; and *Steven* v. *Saunders,* 34 App. D. C. 321).

2. Where, after partial performance of a contract of sale of railroad ties, the buyer commits a breach of the contract by refusing to accept further deliveries, the seller may treat the contract as at an end, and in a suit by him against the buyer for its breach, the measure of damages as to the ties which he had on hand at the time of the breach is the difference between the contract price and the market price; but as to ties not on hand, it is the difference between the contract price and the price at which he would have been able to supply them; and to show what his profit would have been, he may show the prices for which he had made subcontracts for the ties.

No. 2082.  Submitted February 16, 1910.  Decided April 5, 1910.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action for the breach of a contract of sale.      *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decision of the supreme court of the District of Columbia, which was based upon the theory

that the measure of damages for a breach by appellee, the Washington, Baltimore, & Annapolis Electric Railway Company, a corporation, of a contract whereby appellant, E. Hilton Jackson, trustee of the estate of Henry N. Girard, a bankrupt, was to furnish appellee railway ties, was the difference between the contract price and the market value of the undelivered ties not in appellant's hands when the breach occurred.

The material facts are these: On June 16th, 1906, the parties to this suit entered into a contract which, among other things, contained the following, the appellant being designated as the "contractor" and the appellee as the "company," which appellations will be retained throughout this opinion:

"First: The contractor agrees that he will furnish and sell seventy-five thousand (75,000) or more cross-ties and approximately fifty thousand (50,000) feet board measure of switch-ties, free from any and all claims for labor or other charges on same, and all other transportation charges, to the point of delivery herein designated, and in strict accordance with the specifications incorporated herein, which specifications are made a part of this agreement, and are hereby declared and accepted as an essential part of the same.

"Second: The contractor hereby agrees that, in case of failure to furnish and deliver the ties at the times and on the terms herein specified, said company shall be released from any further obligation arising out of this agreement, and said company may proceed to purchase its required ties elsewhere, as it may elect, and any difference in price paid therefor, if in excess of the price herein agreed to be paid, shall be borne and paid by the contractor.

"Third: The contractor further agrees that he will commence shipment at once, and that shipments shall thereafter continue at the rate of 15,000 cross-ties per month, and not less than three sets of switch-ties per month, and that all shipments shall be completed by November 15th, 1906."

The fourth section fixed the prices to be paid for the ties. For the cross-ties two prices were named, according to the freight rates from points of shipment. Section 5 provided for

instalment payments as the ties were furnished. Section 6 contained an agreement by the contractor "to prosecute his work in the most energetic and expeditious manner, and in compliance with the following specifications." The specifications referred to stipulated for delivery at certain, or subsequently designated, points on the company's proposed line of road, "ties to be shipped subject to the inspection of the company's engineers, said inspection to be made at the point of delivery herein designated, or at such other point or points of delivery, as shall be designated by the company, as hereinbefore provided.

"It is further understood the company will accept ties on contractor's inspection at points of shipment, which inspection, however, must be approved by engineers of said company. If not satisfactory, then company shall furnish inspector to inspect ties at points of shipment."

The contractor at once entered upon the performance of his part of the contract. In order to supply these ties, he arranged with several parties to furnish him various amounts, aggregating over 50,000 cross-ties and the entire number of switchties called for in the contract. Some of these subcontractors testified at the trial, and one of them, who had agreed to furnish 10,000 ties, said: "Mr. Girard (contractor) could have gotten twice the number of ties from him (witness) had he wished to." The contractor testified that he "would have delivered from his own mill to the defendant" about 5,000 crossties. Four days after the contract was made, the company wrote the contractor: "We are indeed very much pleased at the activity which you are showing in forwarding ties to us." During the period from July 13th to the 26th, however, the company sent the contractor three letters, asking him to "ease up" on shipments, as they were unable to handle the ties at the rate they were coming in. It does not appear, however, that the ties had been sent faster than stipulated for in the contract.

It appears that not long after the contract was made, the contractor found it necessary to obtain financial assistance in order to carry on the business of supplying ties. This was furnished by the National City Bank of Washington. On July

17th, the company agreed to make all future payments under the contract to that bank. Early in August, creditors of the contractor attached funds in the hands of the company. Though thus involved, it does not appear that the contractor was either unable or unwilling to continue to carry out his contract with the company. On the other hand, as above stated, the company requested him to defer sending more ties for a time. In a letter to the company under date of August 24th, the contractor said: "When you are ready for more ties, etc., advise me, and I will arrange to ship them in as you need them." On October 4th, he again wrote the company to the effect that he had deferred shipment of the ties at its request; that he was ready to carry out the contract; and that he would hold the company liable for all damages which might be suffered in case he was not permitted to carry out the contract. It is worthy of note in this connection that, on September 4th, the company contracted with a third party for between four and five thousand cross-ties of the same quality as those called for in the contract with appellant, but at a price lower than the higher of the two prices named therein, no allowance being made for variations in freight rates. During the latter part of October, some correspondence was had between the contractor and the company, relative to their contract, and on October 27th the contractor asked to have an inspector sent, according to the provisions of said contract, to inspect ties which he was ready to deliver. No inspector was sent, however, and shortly after, the company informed the contractor that the contract was considered terminated, and that it would take no more steps looking to the delivery of any more ties by him thereunder. About November 1st, bankruptcy proceedings were instituted by the contractor, and on December 3rd the trustee appointed therein notified the company that he would hold it liable for breach of the contract aforesaid, expressing a willingness to settle the matter by compromise. The company declining the offer of compromise, and repudiating all liability under the contract, the trustee brought this suit to recover damages for breach of contract.

At the trial, the contractor introduced evidence to the effect that, by reason of the failure of the company to allow him to carry out his contract, he suffered a large financial loss, which represented the profits he would have made. While there was some uncertainty as to the exact number of ties he had on hand when the contract was broken, the evidence introduced by him clearly tended to establish the fact that a large number of the ties which he had contracted for had not been delivered. In addition to his own testimony on this point, the subcontractors testified that they delivered but a portion of the ties called for in their respective contracts. The company introduced no evidence to disprove these statements, or to show that, at the date of the breach, the contractor had on hand all the ties yet to be delivered under the contract. It appeared from the evidence, and was not disputed, that the contract price and the market value of the ties were substantially the same. Accordingly the court, at the instance of the appellee, and over the exception of the appellant, instructed the jury that if they should find a breach of the contract by the company, the measure of damages would be the difference between the contract price and the market value of the ties; hence, they would return a verdict for 1 cent damages. The jury so found, and assessed damages to the contractor at 1 cent.

*Mr. A. Beverly Slater* for the appellant, *Mr. E. Hilton Jackson,* who also appeared in proper person.

*Mr. A. A. Hoehling, Jr.,* and *Mr. Frank Gosnell* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

There are but two assignments of error, both relating to the court's instruction to the jury as to the measure of damages. Since the question as to whether the appellee was guilty of a breach of the contract was submitted to the jury at the instance of the appellee, it is estopped to deny the propriety of

such submission. *Capital Traction Co.* v. *Brown,* 29 App. D. C. 473, 12 L.R.A.(N.S.) 831, 10 A. & E. Ann. Cas. 813; *Steven* v. *Saunders,* 34 App. D. C. 321. We are here concerned, therefore, with the single question of the correctness of the court's instruction as to the measure of damages.

As to the rule of damages to be applied to the ties actually in possession of the contractor when the breach occurred, there is no controversy. The contractor admits that, as to them, damages based on the difference between the contract price and the market value would be proper. Our inquiry, therefore, narrows to the ties not in the possession of the contractor at that time.

The Supreme Court of the United States appears squarely to have met this issue in *Roehm* v. *Horst,* 178 U. S. 1, 44 L. ed. 953, 20 Sup. Ct. Rep. 780. In that case, the plaintiff had contracted with the defendant to supply him with hops for a period of five years, at a fixed price. There was a breach by the defendant after partial performance by the plaintiff. The plaintiff introduced evidence showing at what prices he could have made subcontracts for the sale of the hops which defendant refused to take, these prices being considerably lower than those named in the original contract. After reaffirming the prevailing and undoubted doctrine that after refusal to perform by one party to a contract, the other party need make no further attempt to carry out its provisions, but may consider it at an end, the court said: "As to the question of damages, if the action is not premature, the rule is applicable that plaintiff is entitled to compensation, based, as far as possible, on the ascertainment of what he would have suffered by the continued breach of the other party down to the time of complete performance, less any abatement by reason of circumstances of which he ought reasonably to have availed himself. If a vendor is to manufacture goods, and, during the process of manufacture, the contract is repudiated, he is not bound to complete the manufacture, and estimate his damages by the difference between the market price and the contract price, but the measure of damage is the difference between the contract price and the cost of performance.

*Hinckley* v. *Pittsburgh Bessemer Steel Co.* 121 U. S. 264, 30 L. ed. 967, 7 Sup. Ct. Rep. 875. Even if, in such cases, the manufacturer actually obtains his profits before the time fixed for performance, and recovers on a basis of cost which might have been increased or diminished by subsequent events, the party who broke the contract before the time for complete performance cannot complain, for he took the risk involved in such anticipation. If the vendor has to buy instead of to manufacture, the same principle prevails, and he may show what was the value of the contract by showing for what price he could have made subcontracts, just as the cost of manufacture in the case of a manufacturer may be shown. Although he may receive his money earlier in this way, and may gain or lose by the estimation of his damages in advance of the time for performance, still, as we have seen, he has the right to accept the situation tendered him, and the other party cannot complain.

"In this case, plaintiffs showed at what prices they could have made subcontracts for forward deliveries according to the contracts in suit, and the difference between the prices fixed by the contracts sued on and those was correctly allowed."

In the recent case of *River Spinning Co.* v. *Atlantic Mills,* 155 Fed. 466, the plaintiff contracted to sell, and the defendant to buy, a quantity of wool. It was contemplated that plaintiff would manufacture same at its mills, but there was no limitation to that effect, and the court found that "its [plaintiff's] obligation would have been fully performed by the tender of yarn of like quality, spun at other mills." When the breach took place, the plaintiff had manufactured and had on hand but a portion of the undelivered yarn. As to this yarn, the court held that the measure of damages "should be the difference between the contract price and the value of the yarn in plaintiff's hands." But, as to yarn not manufactured and on hand, the court said: "While this is a just rule to determine a loss of profits on goods ready for delivery at the time of the breach, as was pointed out in *Kingman & Co.* v. *Western Mfg. Co.* 34 C. C. A. 489, 92 Fed. 486, 490, it is not the true rule as to goods not then made and ready for delivery. It is a just rule

for the buyer in a suit by him, because, on the breach, having the money in hand, he may procure the goods on the market, and charge the seller with the difference. But to measure the damages of a seller who has not the goods on hand by the difference between the contract price and the market price is often impractical, and would often be unjust. It would be equally unjust in a case where the seller was to make the goods himself, and in a case where he was to procure the goods from other manufactures or jobbers. If the vendor can make his goods for less than the market price, he is entitled to his actual profit. If his goods are to be bought, or to be made for him by other contractors, above the market price, then his profit would be smaller than the difference between the contract price and the market price. Only if the cost of production and the market price at the breach were the same would the rule be just, and this is practically to say that the rule would seldom be a just mode of determining the loss of profits.

"That there is in a suit by the seller no proper basis for a distinction between goods which he is to manufacture (whether bound to manufacture or not) and goods which he is to buy, instead of to manufacture, is apparent from the reasoning of the Supreme Court in *Roehm* v. *Horst,* 178 U. S. 1, 21, 44 L. ed. 953, 961, 20 Sup. Ct. Rep. 780." See also: *Tufts* v. *Weinfeld,* 88 Wis. 647, 60 N. W. 992; *Olyphant* v. *St. Louis Ore & Steel Co.* 28 Fed. 729; *Eckenrode* v. *Chemical Co.* 55 Md. 51.

The decisions cited leave no room for doubt as to the rule to be applied here in determining damages. We therefore hold that the contractor is entitled to recover the difference between the contract price of the ties which the company refused to take, but which the contractor did not have on hand when the breach occurred, and the amount which it would have cost the contractor to supply them. As to the ties actually on hand at the date of the breach, we have already stated that the measure of damages should be the difference between the contract price and the market value.

The unjustness of the rule contended for by appellee is obvi-

ous.   Its adoption would tend seriously to hamper business transactions, because of the danger of financial loss to which one contracting party might be exposed by a breach which the other could often make with impunity.   The purpose of the law is to discourage, rather than invite, the repudiation of contractual obligations.   When a party to a contract elects to break it, he does so at his peril; he can derive no advantage from his own misconduct.   The damages are to be determined with reference to what the purchaser actually has done, and not with reference to what he agreed to do.   In cases where the purchaser refuses to take goods which the seller actually has on hand, the seller, if there be a market for the goods, can usually dispose of them with no serious inconvenience or loss; but where the seller has not the goods in possession at the time of the breach, a far different situation is presented.   As pointed out above, the manner in which the seller expected to acquire the goods is immaterial in this connection, that is, the seller is no less entitled to relief because he was to obtain the goods from subcontractors or jobbers, rather than manufacture or produce them himself.   The manner of acquisition employed affects merely the profits realized or expected, not the rule of law which makes those profits allowable as damages.   After the purchaser has refused to accept more goods under the contract, the seller not only may, but must, treat the contract as at an end.   In other words, while he may be entitled to damages under the contract, he cannot, after breach thereof, increase those damages by a failure to heed the warning given by the purchaser.   It often happens in contracts of this sort that the seller, especially where he does business on limited capital, which consists mainly of the security or credit created by the contract, is so crippled by the breach that he is forced out of business or to heavy sacrifice.   To compel him to go ahead and acquire the undelivered goods in an attempt to avert the consequences of an act for which he was not responsible would be so manifestly unjust that it merits no further consideration.   It is but equitable that the purchaser should be accountable for a situa-

tion which he has produced; he is estopped to claim any advantage thereby.

As above stated, the just and true rule is to visit upon the party responsible for a situation not contemplated in the contract the embarrassment and damage occasioned by his own conduct. He has agreed that the contract shall cover a certain period, and without reason he has abruptly terminated that contract. We see no reason in law or in equity why the damage occasioned by the breach should not be adjusted as of that date. If the seller has part of the goods on hand, the damages as to those goods will be the difference between the contract price and the market price. As to the goods not on hand, the damages will be the difference between the contract price and the cost of performance; that is, the difference between what the purchaser had agreed to pay for the goods and what it would have cost the seller to supply them. This rule, as previously pointed out, discourages the repudiation of contractual obligations, protects the innocent party, and visits upon the offending party the natural consequences flowing from his misconduct.

The company has placed much reliance on the case of *Yellow Poplar Lumber Co.* v. *Chapman,* 20 C. C. A. 503, 42 U. S. App. 21, 74 Fed. 444. The incompleteness of the report of that case leaves the facts in some doubt. Whether Chapman owned or was in possession of all or only a part of the timber which the company refused to accept after having contracted therefor is somewhat uncertain. At all events, even if the case were in point, and authority for the contention of the company, it would be contrary to the decided weight of authority on this question, as already indicated.

The company now contends that even though it did break the contract, the contractor had all the undelivered ties on hand when the breach occurred; hence, as the contract price and the market price of those ties were the same, he suffered no damage. We have examined the record with care, and find no evidence to substantiate the contention that the contractor had all the undelivered ties on hand when the breach took place. On the contrary, the testimony tends strongly to a conclusion

that he had but a portion of them, which testimony the company, at the trial, made no effort to overcome. In fact, the trial appears to have proceeded upon the theory that he did not so possess them, for at no time did he contend that, as·to the ties actually on hand at the date of the breach, the measure of damages allowed by the trial court was unjust.

The decision is therefore reversed with costs and the case remanded with directions to grant a new trial.     *Reversed.*

A motion by the appellee to restore certain words stricken from the opinion was overruled April 18, 1910.