## GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO. et al.

### No. 214.

District Court, E. D. Virginia,
Norfolk Division.

July 11, 1934, and Sept. 12, 13, 16–18, 1935.

See, also (D.C.) 12 F.Supp. 148.

J. Hume Taylor (of Williams, Loyall & Taylor), of Norfolk, Va., and William Booth and Smith, Buchanan, Scott & Gordon, all of Pittsburgh, Pa., for Massey Concrete Products Corporation and Union Switch & Signal Co.

Edward Duffy and Carlyle Barton, both of Baltimore, Md., and Theodore S. Garnett, of Norfolk, Va., for Continental Trust Co., trustee.

Humes, Buck, Smith & Stowell, of New York City (Baird, White & Lanning, of Norfolk, Va., on the brief), for New York Trust Co. and others, trustees.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for Guaranty Trust Co. of New York and others, trustees.

J. Hume Taylor (of Williams, Loyall & Taylor), of Norfolk, Va., for Pullman Co.

T. H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., and E. V. Mitchell, of Chicago, Ill., for Continental Casualty Co.

T. H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., for H. E. Gibbons, R. J. McCreary Lumber Co., Maintenance Equipment Co., and Western Fruit Express Co.

John W. Oast, Jr., of Norfolk, Va., for Arms-Yager Ry. Car Co.

Braden Vandeventer (of Vandeventer, Eggleston & Black), of Norfolk, Va., for Swift & Co.

J. W. Eggleston (of Vandeventer, Eggleston & Black), of Norfolk, Va., and John M. Daniel, Atty. Gen. of South Carolina, for South Carolina State Highway Department.

T. H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., and Henry T. Stetson, of New York City, for Pintsch Compressing Co.

T. H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., for Woodstock Slag Corporation.

T. H. Willcox (of Willcox, Cooke & Willcox), of Norfolk, Va., and Doggett, McCollum, Howell & Doggett, of Jacksonville, Fla., for A. B. Floyd.

W. R. C. Cocke and B. P. Holland, Jr., both of Norfolk, Va., and Harold J. Gallagher, of New York City, for receivers of Seaboard Air Line Ry. Co.

James Elliott Heath, of Norfolk, Va., special master in Seaboard Air Line receivership.

WAY, District Judge.

Upon considering the master's report and the evidence returned therewith, I am of the opinion that all the exceptions there-to should be overruled and the report approved and confirmed.

References are made in the stipulation of facts and the argument to the action of the railway in charging certain items to capital account, which the master has found were really operating expenses and entitled to priority if furnished within the six months immediately preceding the appointment of receivers. In that connection, see Continental Trust Co. v. Bonsal & Co. (C.C.A.) 72 F.(2d) 975, at page 980, where it is said: "The principles applicable in determining priority for such claims are entirely different from those which control in matters of bookkeeping. Charges to capital account in the books of the railroads are made for the purpose of determining the amount of investment as a basis of rate making, bond issues, etc. Priority is allowed claims for supplies under the six months' rule, not because the supplies have not added to capital, but because they have been necessary to the continued operation of the road and have been supplied with the expectation that they would be paid for out of current income."

While some of the items of this claim come unusually close to the border line of the six months immediately preceding the appointment of receivers, the evidence fails to disclose any special equities pertaining to such items which would justify the court in concluding the master erred in his decision that those items are not entitled to priority. There must be a dead line somewhere, and the decisions have established it in ordinary cases at six months prior to the appointment of receivers. If the court goes a few days beyond that period to allow claims because they are so close to the border, having once broken down the bars, endless confusion as well as inequity will inevitably follow. The sound reasons for this limitation of the time within which such claims must accrue are set forth in Dictaphone Sales Corporation v. Powell et al., Receivers (C.C.A.) 77 F.(2d) 795, 797.

September 16, 1935.

II. In the Matter of the Claim of the Pullman Company.

Claim by the Pullman Company v. L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company. Upon appointment of receivers on December 23, 1930, claimant filed its claim which arose under a con-

tract dated July 13, 1923, and a supplement thereto dated November 14, 1928, between claimant and the railway company. The receivers, pursuant to authority vested in them by the court, elected to adopt the contract. Claimant contended that the adoption of the contract by the receivers made the receivers liable to it not only for the amounts to become due in the future under the contract, but also for what was already due to it by the railway company under the contract prior to receivership. It also contended that even if such adoption did not have that effect, its claim was entitled to priority under the six months' rule. The receivers and the mortgage trustees denied that the adoption of the contract carried the burdens and denied that the claim was entitled to priority. These contentions were made before a special master to whom said claim was referred, who reported to the court "that by the adoption of the contract of the Pullman Company, the receivers became liable for whatever was due that company under the contract prior to the receivership." The special master reported further that a small portion of the claim did not arise under the contract, was not an ordinary operating expense and did not accrue within six months prior to receivership, and was, therefore, not entitled to priority. Upon hearing of exceptions to the master's report filed by claimant, the receivers, and the mortgage trustees. Affirmed.

Special Master's Report No. 29 in the Matter of the Claim of the Pullman Company.

The claim of the Pullman Company about to be considered arises under a contract dated July 13, 1923, between the railway company and the Pullman Company, subsequently modified by a supplemental agreement dated November 14, 1928. Copies of this contract and of the supplement and also of the stipulation between the parties are attached to and made a part of this report.

The receivers, pursuant to the authority vested in them by the order entered December 23, 1930, and subsequent orders extending the period of six months originally allowed them in which to adopt or reject contracts of the railway company, have elected to adopt this contract, as set forth in the following paragraph taken from the stipulation: "From and after December 23, 1930, The Pullman Company continued to furnish to the Receivers equipment and services under said contracts dated July 13, 1923, (as amended by supplemental agreement dated November 14, 1928) and operations under said contract have ever since been continued and are still continued. The Receivers, pursuant to authority vested in them by the Court, have elected to adopt the aforesaid contract between Seaboard Air Line Railway Company and The Pullman Company, dated July 13th, 1923, as modified by supplemental agreement dated November 14th, 1928, and formal statement of their election has been filed in the offices of the Clerks of the Courts, as provided in the original order appointing the Receivers."

It is the contention of the Pullman Company that this adoption has made the receivers liable to it, not only for what may have become due under the contract on and after December 23, 1930, but also for what was then due thereunder. It also contends that, even if such adoption did not have the effect stated, the various items of its claim are entitled to preferential priority under the six months' rule. On the other hand, both the receivers and the mortgage trustees deny that the adoption of the contract has had the effect attributed to it by the claimant. Further, the mortgage trustees deny that any of the items of the claim in question is entitled to preferential priority, and the receivers, in this respect, associate themselves with the mortgage trustees, except as to the items for lighting cars and cleaning cars set forth on page 1 of the stipulation.

1. I have reached the conclusion that the adoption of the contract did have the effect contended for by claimant. When my Report No. 6 was filed, dealing with the question of the alleged adoption of a contract betweeen the railway company and the Arundel Corporation, I was of the opinion that the adoption of such contract would have had the effect of making the receivers liable for anything that might have been due under it prior to the receivership. Authorities contra have been submitted to me at the present hearing, with the result that I am necessarily compelled to entertain some doubt as to a question which I had regarded as settled. I still think, however, that, upon principle, and according to the weight of authority, the view which I have formerly taken was and is the correct view. If, as counsel for the receivers and the mortgage trustees contend, the rule that,

when receivers adopt a contract, they adopt it cum onere, simply means that they adopt each and every part of it from that time on—that they cannot adopt one part, and eliminate another part—then the expression "cum onere" loses all significance. No one would dispute for a moment that to adopt or assume a contract is to adopt or assume the entire contract. Merely to give this effect to the words "cum onere" is to give them no effect. But the reason for the rule that adoption has the effect of adopting cum onere goes deeper than this. It is conceded, of course, that the privilege of adopting or renouncing belongs to the receivers exclusively, and that the other parties to the contracts are bound by them regardless of what their wishes may be, if the receivers see fit reasonably to adopt them. But necessarily, as it seems to me, if a receiver should adopt, he must adopt as a whole and not in part. If he not only has the right to adopt the contract, regardless of the wishes of the other party, but also to adopt it only as of and from the time of the receivership, then he is really given the power to force a new contract upon the other party. It is going far in favor of a receiver to give him the exclusive privilege of adoption; it would be going unreasonably far to give him, not only this privilege, but the further privilege of adopting solely for the future with no reference whatever to the past. For a receiver to be given the right to say to a party: "You have made a contract with my company, under which there is now due you a large amount of money. I don't intend to pay you this money, but to leave you to get it as best you can. However, I shall insist that, from now on, you carry out this contract just as if you had made it with me"—would, I think, be unjust and unreasonable. I think that, in reply to such a demand, the other party would undoubtedly have the right to say: "I am under no legal duty to deal with you at all. I have made a contract with your company which I am willing to perform. But I am only willing to perform it, provided I receive in full the consideration to which I am entitled under it. If you can't pay me what is already due me, so well and good. I shall be compelled to take my chances along with your company's other creditors, but I shall decline to proceed further under it. Upon one condition, and one condition only, will I proceed further under it, and that is that you agree to pay me, as a part of your operating expenses, not only what is to become due to me, but what is already due."

I recognize that the result of this is to give the claimant, as to what is already due, a preference over the other creditors of an insolvent corporation. This is very forcefully stated by Mr. Justice Brewer, in the case of Olyphant v. St. Louis Ore & Steel Co. (C.C.) 28 F. 729, a case to which I shall allude hereafter. But the obvious answer to this is that the receiver is not compelled to adopt any particular contract, and that if he should not adopt it, the other party will not obtain any privilege, but will simply be entitled to his prorata along with all the other creditors of the company. If, however, there should be an adoption, the fact that this preference will result should in no way militate against the other party's right to insist that the adoption should be an adoption of the contract as a whole. The receiver doesn't have to deal with the other party; but, if he should deal with him, it must be upon terms satisfactory to him. Otherwise, as I have pointed out, the receiver would really have the right to force a contract which suited him upon an unwilling party.

The cases cited by counsel for the Pullman Company, to wit: Easton v. Huston & T. C. Ry. Co. (Circuit Court E.D.Tex.) 38 F. 784; Farmers' Loan & Trust Co. v. Northern Pacific R. Co., 58 F. 257 (Circuit Court E.D.Wisconsin); Atchison, T. & S. F. Ry. Co. v. Hurley, 153 F. 503 (C.C.A.8); Eames v. H. B. Claflin Co., 220 F. 190 (District Court S.D.New York); Odell v. Bedford Co., 224 F. 996 (District Court E.D.New York); and the opinion in the Minneapolis & St. Louis Railroad Company Receivership,[1] are in point and support its contention. To these authorities may be added the case of Cooper v. McNair (D.C.) 49 F.(2d) 778. In that case a National Bank had employed plaintiff, an attorney, to prosecute a civil suit in its behalf. Before the suit was completed the bank became insolvent and a receiver was appointed. The receiver discontinued plaintiff's services and proceeded with the suit with other counsel. Plaintiff sought to recover against the receiver on the ground that his services rendered prior to the receivership were a preferred expense of administration, because, as he alleged, the receivers, although they had employed oth-

---

[1] No opinion furnished for publication.

er counsel, had gone on with the suit which he (plaintiff) had instituted, and such action was an adoption of the contract by which he (plaintiff) had been retained as attorney prior to the receivership. The District Judge (Strum) very properly decided against this view, but it is clear from his opinion that, if the plaintiff's services had been retained for the purpose of carrying on the suit, the court would have held that he was entitled to what was due him for bringing the suit as well as for carrying it on, or, in other words, that to have continued plaintiff as receiver's attorney would have been the assumption of what was due him prior to the receivership as well as of what became due after the receivership. The language of the court upon this point is as follows [49 F.(2d) 778, at page 780]: "Plaintiff's services were performed prior to the appointment of a receiver. Plaintiff's fee for past services did not accrue during the existence of the receivership, nor did the receiver assume its payment, *nor did he elect to perform the bank's executory contract with plaintiff.* For the receiver to proceed with the suit instituted by plaintiff is not such an acceptance of the benefits of plaintiff's executory contract with the bank *as to create a liability against the receiver for plaintiff's past services,* such as the acceptance of the benefits of a building contract by continuing the executory contract for the construction thereof, because the nature of the relation between attorney and client is such that the client may always discontinue the services of his attorney, leaving the attorney to the recourses already stated for his past services. 6 C.J. 676." (Italics supplied.)

To the same effect, it seems to me, is the reasoning of the court in Sunflower Oil Co. v. Wilson, 142 U.S. 313, 12 S.Ct. 235, 237, 35 L.Ed. 1025; Quincy, etc., Ry. Co. v. Humphreys, 145 U.S. 82, 12 S.Ct. 787, 36 L.Ed. 632; St. Joseph & St. Louis R. R. Co. v. Humphreys, 145 U.S. 105, 12 S.Ct. 795, 36 L.Ed. 640; and United States Trust Co. v. Wabash Western Railway Co., 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085.

In the first named of these cases, Mr. Justice Brown used this language: "The receiver did not, simply by virtue of his appointment, become liable upon the covenants and agreement of the railway company. High, Rec., § 273; Hoyt v. Stoddard, 2 Allen [Mass.] 442. Upon taking possession of the property, he was entitled to a reasonable time to elect whether he would adopt this contract and make it his own, or whether he would insist upon the inability of the company to pay, and return the property in good order and condition; paying, of course, the stipulated rental for it so long as he used it. Turner v. Richardson, 7 East, 335; Commonwealth v. Franklin Insurance Co., 115 Mass. 278; Sparhawk v. Yerkes, 142 U.S. 1, 12 S.Ct. 104, 35 L.Ed. 915. Of course, if he elects to take property subject to a condition, he is bound to perform the condition before he can obtain title to the property."

This language, I think, indicates that the payment of what was due under a contract at the time of a receivership was one of the conditions subject to which the receiver took property; and that, if he elected to take property which was subject to such a condition, he was bound to perform the condition.

The state cases cited by counsel for claimant of H. D. Roosen Co. v. Pacific Publishing Co., 123 Cal.App. 525, 11 P.(2d) 873, and Brandenburg v. Coxe, 228 Pa. 212, 77 A. 455, also support its contention.

Now, as opposed to these cases, we have, first, the case of Olyphant v. St. Louis Ore & Steel Co. (C.C.Mo.) 28 F. 729, to which allusion has already been made. The facts in that case were as follows: A receiver of the St. Louis Ore & Steel Company, which, in addition to maintaining and operating coal and ore mines, also maintained and operated a railroad, had been appointed at the instance of the trustee of one of the mortgages executed by it. In the order appointing the receiver the latter was directed to carry out and perform the contracts of the Ore & Steel Company, to preserve and protect all its property, and to collect, as far as possible, all accounts due it. At that time the Ore & Steel Company owed the Lackawanna Iron & Coal Company a balance of $22,040.33 for rails sold and delivered to it under a continuing contract. No further deliveries were accepted by the receiver after his appointment, and consequently the Lackawanna Company also set up a claim for damages on this account. So that it would appear that the receiver, notwithstanding he was authorized to perform the contracts of the Ore & Steel Company, considered this as permissive and not mandatory, and, in fact,

did not adopt the contract with the Lackawanna Company. So that, notwithstanding the broad language of Mr. Justice Brewer, which, I admit, does apparently support the view of the mortgage trustees and receivers, the facts in the case are very different from the facts in this case. There the receiver, although authorized to adopt, did *not* adopt. Notwithstanding the authority given him, he had no further dealings with the Lackawanna Company after his appointment. If, pursuant to the authority contained in the order appointing him, he had expressly adopted the contract with that company, and had thereafter received rails from it under the contract, Mr. Justice Brewer's broad language would, if not controlling, be much more persuasive than it is under the circumstances. As a matter of fact, all that the court actually decided in that case was that a mere authority to adopt, not followed by further deliveries under the contract after the receivership, would not amount to an adoption.

The case of Westinghouse Electric Co. v. Brooklyn Rapid Transit Co., 291 F. 836, 837 (D.C.New York), is not in point, because there was in fact no adoption of the lease by the receiver in that case.

The opinion in the case of Durand & Co. v. Howard & Co., 216 F. 585, L.R.A.1915B, 998 (C.C.A.2), cited by counsel for the receivers, contains expressions not in harmony with the view which I have taken, but the point actually decided in that case was that a landlord, who having a right of re-entry and forfeiture for nonpayment of rent prior to a receivership, came into court after the receivership and asked the court to fix a time within which the receivers should adopt or renounce the lease, and thereafter appeared again for the same purpose, had recognized the lease as still in force, and by such conduct had, under the law of New York, waived his right to forfeiture. It does not appear that, in the final result, the rent due prior to the receivership was not recognized as a receivership expense. It only appears that, for the reasons which I have stated, a forfeiture was not allowed against the receivers for rent due prior to the receivership.

The cases of Monsarrat v. Mercantile Trust Co., 109 F. 230 (C.C.A.6), and Republic Supply Company v. Richfield Oil Company, 59 F.(2d) 35 (C.C.A.9), are not,

I think, in conflict with the view here adopted, and require no comment from me.

The decision of Judge Mayer, affirming the report of Special Master Lacombe, in the case of Westinghouse Electric Co. v. Brooklyn Rapid Transit Co., referred to in the brief of counsel for the receivers, holding that a receiver was not liable for damages sustained under a contract (which had been adopted by him) prior to the receivership, but was liable for the retained percentage of the contract price in respect to work done under the contract prior to the receivership would, it seems to me, sustain the contention of the claimant here.

Since this case was argued, counsel for the receivers have called my attention to the case of Title Guarantee & Trust Co. v. 457 Schenectady Ave., 260 N.Y. 119, 183 N.E. 198, 86 A.L.R. 347, in which it was held that a public service company, such as a water company or electric light company, had no right to cut off the water or light because of the failure of the receiver to pay what was due for services rendered prior to the receivership of the insolvent debtor. This would not be disputed. Unquestionably, the receiver, whether he had adopted a prior contract or not, would have the right to all necessary services from a water company or electric light company as long as he paid his own bills.

I therefore am of the opinion, as already stated, that, by the adoption of the contract of the Pullman Company, the receivers became liable for whatever was due that company under the contract prior to the receivership. The receivers concede that there is thus due the following:

$ 9,914.16 which accrued within six months prior to the receivership;

$ 1,483.74 which the receivers claim accrued prior to June 24, 1930, but which the Pullman Company contends accrued subsequent thereto;

$ 584.28 which admittedly accrued prior to June 24, 1930;

$11,982.18 total due the Pullman Company.

I am of the opinion that the item of $1,483.74 did accrue subsequent to June 24, 1930. In any event, however, as the

receivers, by their adoption of the contract, have assumed whatever was due under it prior to the receivership, I report that they are liable for this item, and also the item of $584.28, as well as the item of $9,914.16, making a total of $11,982.18. The item of $585 for car service I do not think comes under the contract at all. This was a wholly independent contract, standing entirely by itself, and was not affected by the adoption of this contract. Its right to priority is discussed hereafter.

2. The receivers and the mortgage trustees contend that the railway company was not liable, under the aforesaid contract, for the following items:

| | |
|---|---|
| Damage to train lines........................ | $ 60.49 |
| Lighting tourist and private cars............ | 931.07 |
| Lighting tourist and private cars........... | 78.36 |
| | $1,069.92 |

We will consider first the item of $60.49. Claimant contends that this is covered by article II, section 1, of the contract, which provides as follows: "Section 1. The Railway Company shall repair and make good all damages to any of the cars operated under this agreement resulting from accident or casualty or fire on the lines of the Railway Company, and on any other railroads with which The Pullman Company has no operating agreement upon which any such cars may be run at the direction of the Railway Company, except damages resulting from accident or casualty or fire originating inside such cars or from the negligence of employees of The Pullman Company."

The question is: Did this damage result from accident or casualty or fire? The stipulation in regard to this is as follows: "This claim is on account of breaking and pulling apart of steam hose, steam end train line valves, air hose, angle cocks, train lines, and similar equipment on Pullman cars while in service under the contract. It is not known how the damage occurred, it merely appearing that the equipment was damaged as stated when returned to The Pullman Company. The Railway Company refused to recognize its alleged liability, and the Receivers and the Mortgage Trustees contend that there is no liability for such items under the contract, as it does not appear that the damage arose 'from accident or casualty or fire' which words are used in the aforesaid contract to define the liability of the Railway Company. The Pullman Company, on the contrary, contends that the condition of the equipment was such as would not result from the wear of ordinary operation and could only have been caused by some 'accident or casualty' while in service under the contract, for which the Railway Company assumed responsibility under said Article II, Section 1."

Inasmuch as it is not known how the damage occurred, and it is not shown that it could not have resulted from the wear of ordinary operation, and inasmuch as the burden is on the Pullman Company to show that it did not so result, I hold that there is no liability on the Receivers for this item.

As to the items for lighting tourist and private cars: It is stipulated that such cars are not included in the standard sleeping cars and parlor cars mentioned in article I, section 2, of the contract. This means that such cars do not come within the scope of the contract at all. I have, accordingly, nothing before me to show whether the railway company or the Pullman Company was to light these cars. Have I the right to infer, simply from the fact that the railway company was required to light the cars which are mentioned in the contract, that it was obligated to light these cars also? I do not think that I have the right to assume this. Here again the burden is upon the Pullman Company to establish its claim and, while such lighting might be a reasonable requirement, especially in view of the fact that the railway company agreed to light the other cars, I do not think that it has shown any such undertaking as to the cars in question.

3. It is also claimed that all the items of this claim are entitled to priority under the six months' rule. The items are as follows:

| During the six months' period: | |
|---|---|
| Lighting cars................................ | $ 5,168.83 |
| Cleaning cars................................ | 1,448.72 |
| Refund of railroad fares paid by Pullman inspectors under article 1, section 2..... | 144.92 |
| Repairs to car "Moberly".................... | 3,151.69 |
| Cars carrying surgeons to convention...... | 585.00 |
| Repairs to Pullmans damages on June 23, 1930, and delivered by railway to Pullman on June 24, 1930...................... | 1,483.74 |
| Refund of railroad fares paid by Pullman agents prior to June 24, 1930, under article III, section 2....................... | 584.28 |
| | $12,567.18 |

Damage to train lines prior to June
24, 1930 ........................... $ 60.49
Lighting tourist and private cars
prior to June 24, 1930.............. 931.07
Lighting tourist and private cars
subsequent to June 23, 1930........ 78.36
——————
1,069.92

I think that substantially all the questions involved in the consideration of these items have been passed upon by me, and that none of the items is entitled to priority.

The two items, for lighting cars, $5,168.83, and cleaning cars, $1,448.72, present more difficulty than the others. But I agree with counsel for the mortgage trustees that the contract between the railway company and the Pullman Company is a rental contract, and that these two items are really a part of the rental of the cars. The railway company needed these cars—it had to rent them in order to have them—and the rental cost was simply increased by the expense incurred or services performed by the Pullman Company in lighting and cleaning the cars. In the case of Pullman's Palace-Car Co. v. American L. & T.. Co., 84 F. 18 (C.C.A.8), the Pullman Company charged the flat sum of 3 cents per mile for keeping in repair the running gears of its cars. It was contended that this was not car rental but a claim for keeping the cars in condition to carry passengers. The court, however, held that it was simply a part of the stipulated compensation for the use of the cars. So, here, the obligation on the part of the railway company to light or heat the cars, or to pay the Pullman Company for lighting or heating them, is simply a part of the compensation or consideration for the use of these cars. In a reply memorandum filed with me by counsel for claimant on December 29, 1933, an earnest effort is made to distinguish this case from the former case, but I am of the opinion that this cannot be done. Upon the authority of that case, I hold that these two items are not entitled to preferential priority.

Nor is the claim for refund of railroad fares paid by Pullman inspectors entitled to priority. These were certainly not operating expenses.

The repairs to the 'car "Moberly" are not entitled to preference for the reason that the car repair claims are not operating expenses.

The claim for the cars carrying surgeons to convention is obviously a car rental claim, and therefore not entitled to preference.

The repairs to cars on June 23, 1930, come under the same rule as the repairs to the "Moberly" just mentioned. As already stated, I should not have considered this claim as having arisen more than six months prior to the receivership, if it were otherwise entitled to priority.

The refund of railroad fares paid prior to June 24, 1930, are not entitled to priority, for the reason already stated; and for the further reason that they did not arise within the six months' period.

Even if the items of $60.49, damage to train lines, and $931.07, lighting tourist and private cars prior to June 24, 1930, were obligations of the railway company, they would not be entitled to priority, because they did not arise within the six months' period, and because such claims are not entitled to priority. But, as already reported, these two items were not obligations of the railway company. The items of $78.36, for lighting tourist and private cars subsequent to June 23, 1930, is not entitled to priority because, as already reported, not an obligation of the railway company, and also because, if it had been such obligation, it was part of a rental compensation.

For the foregoing reasons, I report that the adoption of the contract by the receivers has made the receivers liable to the Pullman Company in the sum of $11,982.18; that the item of $585, while not a preferred claim, is allowed as a general claim; that the item of $1,069.92 was not a liability of the railway company, and consequently is not a liability of the receivers; and that no part of the claim is entitled to priority under the six months' rule.

No finding is made at this time as to whether said claim should bear interest, or, if so, during what period.

No finding is now made as to what funds and/or property coming into the hands of the receivers are subject to, or available for, the payment of this claim.

WAY, District Judge.

After mature consideration of the special master's report, I have concluded that

the same should be approved and confirmed, for the following reasons:

■ 1. Considering the length of time the contract between the Pullman Company and the Seaboard Air Line was to continue in force, namely, from July 1, 1923, to June 30, 1938, fifteen years; the control which that company retained over its cars while on the railway's lines; that the Pullman Company collected and kept the Pullman fares, and was obligated to indemnify and save harmless the railway against liabilities and claims for loss or damage to or destruction of property and for injuries to persons; the provisions in the revised and supplemental agreement of November 14, 1928, with respect to the division of the gross revenue derived from cars, and with respect to the right of the Pullman Company to terminate the agreement and the right of the railway company to purchase the cars, as well as other provisions of the contract—I think it is clear that this was not a usual or ordinary obligation of operation but was unusual and that debts made pursuant to its provisions are not entitled to priority. It seems to me that the facts in Pullman's Palace-Car Co. v. American Loan & Trust Co. (C.C.A.8)· 84 F. 18, are directly in point.

■ 2. The master's conclusion that when the receivers adopted the contract, they did so cum onere, appears to be just and equitable. The change in the status of those debts which he found that the railway owed to the Pullman Company at the time of the appointment of receivers, and which were made pursuant to provisions of the contract, from that of general claims against the receivership estate to obligations of the receivers, was a mere incident of adoption of the contract. Such change in the status of the debts was in no sense the purpose or a major result of adoption by the receivers. Compared with the importance of that part of the contract still to be performed, the amount found by the master to be owing pursuant to its provisions is rather insignificant, so that the facts of the case do not present a situation where adoption can operate substantially to displace prior liens, seriously disturb existing priorities or unduly burden the receivership.

An order approving and confirming the master's report (No. 29) will accordingly be entered upon presentation.

September 12, 1935.

III. In the Matter of the Claim of the Union Switch & Signal Company.

Upon hearing of exceptions filed by Union Switch & Signal Construction Company to special master's report denying priority under the six months' rule to certain supply claims filed with the receivers of the Seaboard Air Line Railway Company. Affirmed.

Special Master's Report No. 30 in the Matter of the Claim of the Union Switch & Signal Company.

From the stipulation of facts, a copy of which is attached hereto and made a part hereof, it appears that the railway company is indebted to the Union Switch & Signal Company (hereafter referred to as claimant), a Pennsylvania corporation, in the sum of $23,530.92, representing the purchase price of materials and supplies furnished to the railway company by the claimant between June 23, 1930, and December 24, 1930. The claim has been classified so that it may be considered item by item.

1. The item of $4,716.03 was placed in class 1, and its right to priority has already been passed upon, having been allowed by me in my report No. 1, and thereafter confirmed by the court.

2. The item of $2,353.69 was at first placed in classes 1-A and 19, because charged by the railway to "Capital Account" under the Interstate Commerce Commission rules. According to the stipulation, the materials and supplies, of which the above sum was the purchase price, were sold and purchased to be used in connection with the proposed installation of automatic signals from Brown street, Richmond, Va., to Hermitage, in connection with the construction of an additional track. The proposed installation of the signals was abandoned, and the original charge of the cost of the materials to "Capital Account" was changed to maintenance; it appearing that the materials were of such a character that they were susceptible of being used for either new installation or for operation and maintenance work, and that, when the installation project was abandoned, the materials were sent to the general storehouse and were there commingled with the railway's stores of a like character, to be withdrawn from time to time as materials of that character might be required. The stipulation does not expressly state what ulti-

mately became of these materials, but I think it fair to assume that they were used for maintenance or operating purposes. But, although this be true, I am of the opinion that, where materials are both sold and purchased for construction purposes, that is to say, where it was understood at the time of the purchase, by both the seller and the purchaser, that they were to be used for construction purposes and not for operating purposes, a change of purpose by the purchaser should not entitle the seller to priority. It has been very well said by one of the counsel for the mortgage trustees that all sellers of supplies to a railway company look to the earnings of the company for their payment; so that this is not the decisive feature of priority claims. But a preferential creditor does more than this; he not only looks to the earnings, but, if need be, to the interposition of a court of equity. If, when he sells, he has no thought that he may need the interposition of a court of equity, it would seem that he could not by any possibility be a preferential creditor. Now one who sells for construction purposes is aware of the fact that he cannot look to the interposition of such a court. That court interposes only in behalf of those who sell for operating purposes. I am of the opinion, therefore, that the claim of priority as to this item cannot be sustained.

3. I think that the project at Boykins, Va., in connection with which the indebtedness of $20 was incurred, was a construction item, and is not entitled to priority.

4. The other item of $20 was incurred in connection with the installation of an electric highway crossing signal at Weldon, N. C. The signal was installed to replace crossing gates and to do away with the necessity of watchmen to operate the gates. The gross cost of the project was approximately $2,000. I think that this was neither repair nor replacement work, but wholly new construction, and therefore not entitled to priority.

5. I think that the same thing is true as to the item of $2,110.60 for miscellaneous materials acquired by the railway company in connection with the installation of an interlocking plant at Bladen, Ga. There had been no such interlocking plant at this point before, nor had there been, before the interlocking plant was installed, any device which was superseded by it. This was purely original construction.

6. The balance of the claim, $14,310.-60, represents the purchase price of miscellaneous materials and supplies purchased by the railway company in connection with, but not sold by the claimant for, the installation of remote controlled switches at Wake Forest, Apex, Moncure, Aberdeen, Southern Pines, Cameron, Sanford, Hamlet, and Monroe, all in North Carolina, and McKenny, Va. That is to say, that claimant did not know, when he sold the supplies, for what purpose, whether construction or operation, they were to be used. The installation of these switches was not part of a general plan or scheme, but each was an entirely unrelated project. They were installed in order to increase the efficiency of the operation of the railroad; to speed up the schedules, and to reduce the cost of operation—all as set forth in the stipulation. These remote controlled switches were not repairs. They were, although they superseded switches operated by hand, additions and betterments, far exceeding in cost the switches which they replaced; it being stated in the stipulation that the gross cost of the installation of a remote controlled switch is between $11,000 and $12,000, whereas the cost of the installation of a hand operated switch is less than $1,000. The two things are so essentially different, and the one so much more expensive than the other, that I do not think that we can consider the remote controlled switches as other than new construction.

I am aware that I have held that the new Appomattox River Bridge, which took the place of an old bridge, was an operating expense, and that the court has confirmed this report. But that case can be distinguished from this, not only by reason of the essential difference in the present case between the hand controlled switch and the remote controlled switch, but by reason of the great disparity in the cost between the two, and the further fact that, in the case of the bridge, a new structure had become absolutely necessary. I feel, too, that that claim, while correctly decided, was near the border line.

I am therefore of the opinion no part of this claim is entitled to priority under the six months' rule.

WAY, District Judge.

The court has concluded that these exceptions should be overruled and the report of the special master confirmed.

██ It appears from the stipulation of facts that the item of $2,353.69 represents the consideration for materials originally purchased for use in connection with the installation of automatic signals in connection with an additional track from Brown street, Richmond, to Hermitage. The track was constructed but installation of the signals was abandoned, and the materials were sent to the railway's general storehouse and there commingled with other materials of like character. It is true, as pointed out by counsel for claimant, that priority attaches to the debt, not to the claimant, and that knowledge on the part of claimant at the time he furnishes the material that he is entitled to priority is not essential. Nevertheless, it is essential that the consideration for the debt be a current expense of ordinary operation of the railroad necessarily incurred to keep the railroad a going concern. Materials purchased for new construction, as occurred here, do not fall in that class. Mere abandonment of that part of the new construction in which the materials were intended to be used, after they have been purchased, and storing them in the railway's general warehouse, could hardly operate to change the character of the materials from new construction materials to ordinary and necessary operating supplies.

██ The master's conclusions on the other items of the claim to the effect that, in each instance, the materials were ordered for new construction projects or for additions and betterments not absolutely essential, but which greatly exceeded the cost of that which they were intended to replace, and were therefore not entitled to priority as usual and necessary operating expenses, are supported by the evidence and clearly correct.

September 16, 1935.

## IV. In the Matter of the Claim of Continental Casualty Company.

Claim by Continental Casualty Company v. L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company. Upon the appointment of such receivers on December 23, 1930, claimant filed its claim for $7,327.04, representing 95 per cent. of the amounts deducted from the wages of various employees of the railway company for the purpose of paying premiums on insurance covering said employees. The deductions were made by the railway company in May and June, 1930, pursuant to the terms of a contract between the railway company and claimant. The wages from which said deductions were made all accrued more than six months prior to appointment of the receivers. From the total amount deducted the railway company deducted and retained as its compensation 5 per cent. as provided by said contract. Prior to the appointment of receivers the railway company delivered to Continental Casualty Company a draft for the above amount drawn on its treasurer, but said draft was not cleared on account of appointment of receivers. The claim was referred to a special master who heard testimony and made a finding that (1) the claim having accrued more than six months prior to the receivership was not entitled to priority, and (2) while the transaction created an equitable assignment in favor of claimant, it did not create a trust fund and the claim was therefore not entitled to priority on that ground. Upon hearing of exceptions filed by claimants to the report of the special master. Affirmed.

Special Master's Report No. 28 in the Matter of the Claim of Continental Casualty Company.

The stipulation of facts in regard to this claim is as follows:

"It is agreed between the parties as follows:

"1. The Railway Company is indebted to the Continental Casualty Company in the sum of Seven Thousand Three Hundred Twenty-seven Dollars and Four Cents ($7,327.04), representing 95% of the amounts deducted from the wages of various employees for the purpose of paying the premiums on insurance covering said employees. Said deductions were made by the Railway Company in the months of May and June, 1930, pursuant to the terms of a contract between Seaboard Air Line Railway (predecessor of Seaboard Air Line Railway Company) and the Continental Casualty Company, dated August 5, 1913, and orders for said deductions given the Railway Company by the wage earners involved. * * * The wages from which said deductions were made all accrued prior to June 24, 1930. From the total amount

deducted, the Railway Company deducted and retained as its compensation, 5%, according to the terms of said contract. Prior to the appointment of Receivers the Railway Company delivered to the Continental Casualty Company a draft or drafts embracing the above amount drawn upon its Treasurer, but said drafts were not cleared, on account of the appointment of Receivers, and the claimant was compelled to pay $17.00 protest fees on said drafts.

"2. Drafts or vouchers drawn upon the Treasurer of the Railway Company in payment of the amounts due the claimant were from time to time paid by the said Treasurer from funds of the Railway Company on deposit in the Norfolk National Bank of Commerce & Trusts of Norfolk, Virginia, and the American National Bank of Portsmouth, Virginia * * *. At all times after the accrual of said claim and every part thereof, and up to the date the Receivers were appointed, the Railway Company had on deposit to its credit in each of said banks amounts in excess of $7500, free and clear of any liens, and not ear-marked or appropriated for any particular purposes * * *. Said sums of money on deposit as aforesaid went into the possession of the Receivers upon their appointment and qualification, and since that time the deposit in each of said banks to the credit of the Receivers has always exceeded the amount of said claim.

"3. The wage earners in question were paid by drafts drawn upon the Treasurer of the Railway Company, the drafts in each case being for the net amount due each wage earner after deducting the amount of premium due by him. * * *

"4. Said Railway Company showed on its books of account and records that it was entitled to 5% of the amounts deducted from the pay rolls and that it was indebted to the Continental Casualty Company in an amount equal to the deductions less said 5% deducted for its compensation.

"5. The Continental Casualty Company never knew until after objection was made to the allowance of priority to its claim for the amount herein set out that said Railway Company did not earmark in or separate or withdraw from, its general deposits containing funds of the Railway Company, amounts due the Casualty Company. * * *"

In my opinion no trust relation existed between the railway company and the Continental Casualty Company, hereinafter referred to as claimant, as to the 5 per cent. of the wages of the railway company's employees held back by the railway company. The relation between the railway company and its employees was of course merely that of debtor and creditor. By the orders given by the employees against their wages, the claimant became the assignee of 5 per cent. of such wages as and when the same became due and payable. This was simply an equitable assignment. By the terms of the contract between the predecessor of the railway company and the claimant dated August 5, 1913, the railway company became directly liable upon its promise to the claimant. As a result, we have an equitable assignment plus the promise on the part of the obligor to pay to the assignee the amount thereof. This did not create a trust relation. An assignment doesn't make the obligor a trustee for the assignee. At common law, the assignee could only recover against the assignor in equity; it required the direct promise of the obligor to the assignee to enable the latter to sue at law. This is still true in Virginia as to a partial assignment, but, by statute, the assignee of an entire fund can sue at law. Accordingly, but for the superadded promise of the railway company, the assignee in this case, the assignment being partial, would have been compelled in order to recover to proceed against the obligor (the railway company) in equity; the superadded promise brought about a debtor-creditor relation between the railway company and the claimant. That an obligor, in this case the railway company, could become the trustee of its own obligation, either to its employees, or to their assignee, is an utter incongruity. An obligor cannot be the trustee of its own obligation. I do not mean to say that a trustee is not in a sense a debtor, for I recognize that the claim of a cestui que trust against a trustee is in the nature of a chose in action. What I do mean to say is that where A is indebted to B, he cannot become the trustee of that indebtedness. Of course, B could put money in A's hands as trustee for his (B's) benefit. Under these circumstances, A would not only be trustee, but, if he should default as trustee, would become a debtor as well. But, except in such a case as I have mentioned, A could not

become trustee of his previous indebtedness to B. In other words, by no possibility could the railway company, which was simply a debtor to its employees, change itself into a trustee as to these employees. And, if it could not change itself into a trustee so far as its employees were concerned, it could not do so as to the assignee of those employees. The assignee stands on precisely the same ground as its various assignors. The situation is simply this: The railway company, instead of paying its employees 100 per cent. of what was due them, has paid them 95 per cent., and owes the remaining 5 per cent. to the claimant.

The case of McFadden v. Jenkyns, 1 Phil.Ch. 153, Scott's Cases on Trust (2d Ed.) p. 36, does, I admit, hold that an obligor may become trustee of his own obligation. I do not think that that case would be a controlling authority here because the facts are too different. There the creditor, Warry, expressly directed Jenkyns, the debtor, to hold the money *in trust* for Mrs. McFadden. Here nothing was said about any trust, and obviously the railway company had no thought of making itself a trustee, and for this reason should not be held to have assumed a trust. But the decision of Lord Lyndhurst in McFadden v. Jenkyns, supra, has been severely criticized by such an authority as the late Professor James Barr Ames, of Harvard, and has been repudiated by such judges as Lord St. Leonards and Lord Wensleydale on the same grounds as those indicated above, viz., that a debtor cannot be trustee of his own indebtedness. See 6 H.L.C. at pages 951, 968.

The case of Northwest Lumber Company v. Scandinavian American Bank, 130 Wash. 33, 225 P. 825, 39 A.L.R. 922, is also relied upon by counsel for claimant. This case is an authority for the proposition that, if the railway company were still a going concern, and had had in a particular bank a large balance, and had, shortly before the failure of that bank, drawn a check to the order of the bank against its deposit with the understanding that the bank would collect this check and pay the casualty company the 5 per cent. of the employees' wages which had been retained by the railway company, and the bank had thereafter become insolvent, the drawing of such check pursuant to such understanding would have made the

bank a trustee for the railway company for the amount of the check. The decisions in regard to funds deposited in bank for a special purpose are not consistent. See In re Warren's Bank, 209 Wis. 121, 244 N.W. 594, 86 A.L.R. 371; Northern Sugar Corporation v. Thompson, 13 F.(2d) 829 (C.C.A.1926). See, too, an article in 42 Yale Law Journal, at page 1125, entitled "Preferential Treatment of Funds Deposited Under Special Contract." It will be noted that, whereas in the Northwest Lumber Company Case there was a particular fund drawn against, in the present case there has been no deposit of any fund in any bank by the railway company against which it was to draw for the wages of the employees and the amount due this assignee, the claimant, but that payment was to be made by drafts drawn against itself—that is, by drafts against its general funds. The bank element is, therefore, absent from this case. We haven't the case of a deposit by the railway company for a special purpose. We have simply the case of the nonpayment by it of 5 per cent. of the amounts due its respective employees, and an obligation on its part to pay the aggregate of these amounts to some one else. As I have said, the decisions in the bank cases are not harmonious (see Northern Sugar Corporation v. Thompson, supra), but even those holding in favor of the creation of a trust, whether in favor of a depositor or a creditor of the latter, would not justify my holding in favor of the claimant here.

Neither the case of Keller v. Washington, 83 W.Va. 659, 98 S.E. 880, nor that of McKee v. Lamon, 159 U.S. 317, 16 S.Ct. 11, 40 L.Ed. 165, cited by counsel for claimant, require any discussion. The opinion in the case of In re Interborough Consolidated Corporation, 288 F. 334, 335, 32 A.L.R. 932 (C.C.A.2), contains a full discussion of the question of trusts and equitable charges, and equitable liens, growing out of the deposit of funds for specific purposes, and out of promises to pay out of particular funds; with all of which the courts generally are in accord. But the actual decision was to the effect that a deposit of currency in bank, the depositor intending to use it to pay a particular obligation, but without any agreement to that effect with the creditor, creates no equitable lien on the deposit in favor of such creditor. If, in

the instant case, the railway company had deposited the sum of $7,327.04 in bank, and had expressly agreed with the Continental Casualty Company that it would apply the same in payment of the 5 per cent. due the latter, it might be successfully contended that this had created an equitable assignment of this precise fund. But we have no such case. There has been no deposit of any fund; the railway company's employees assigned no particular fund, but only an indebtedness due them; and there has been no promise to pay out of a particular fund, or to turn over a particular fund, but only a promise to pay generally—that is to say, to pay out of the railway company's entire estate. No case, unless it is that of McFadden v. Jenkyns, supra, would sustain the finding of a trust relation under such circumstances.

In the case of Millett v. Omaha National Bank (C.C.A.) 30 F.(2d) 665, it was held that a trust had been created, because Montgomery had paid over to the Drovers National Bank specific funds, which it had agreed to apply to a specific indebtedness. There is, of course, no difficulty in finding a trust relation here for the benefit of the Omaha National Bank, to which the Drovers National Bank had expressly agreed to pay over that which it had received from Montgomery.

Again in the case of In re Danville Hotel Company, 33 F.(2d) 162, we have a specific fund provided for a specific purpose. Here was undoubtedly a trust relation, and the only question before the court was whether the creator of the trust or the intended beneficiaries were entitled to it. It was held that the fund went back to the creator because of the fact that the beneficiaries had failed to comply with certain conditions.

With all due deference, it seems to me that, if the facts in this case should be held to establish a trust, then all distinctions between a trust and a debt would be abolished. I, therefore, am of the opinion, and report that the claimant is not the beneficiary of a trust, but only a general creditor. Having reached this decision, it is unnecessary to consider the second question discussed in claimant's brief.

WAY, District Judge.

In this case it seems to me that the effect of the contract of August 5, 1913, as the same was construed and applied by the parties, was to cause the railway to become debtor to the insurance company instead of the employee for a part of the employee's compensation in a given period. In other words, the railway company at a given time, instead of owing the employee a full month's salary, under the arrangement, owed to the insurance company the amount of premium due for such period from the employee to the insurance company, and the balance remaining after such deduction to the employee. There were two creditors where, except for the arrangement, there would have been only one, entitled to receive the month's salary in the proportions agreed upon. I think it is clear from the facts stipulated and the manner in which parties proceeded in carrying out the contract that that is the interpretation which they placed upon that instrument. No money ever passed from employee to the railway to be paid to the insurance company. The effect of the railway's bookkeeping entries was to show the railway indebted to the insurance company instead of the employee, for the amount of premium due the insurance company for a particular period involved, and the insurance company looked to the railway, not the employee, for the payment thereof. Manifestly, such arrangement falls short of making the railway a trustee, liable to account as such to the insurance company.

I find also that no special facts or circumstances are disclosed by the evidence which would justify the court in departing from the six months' rule.

An order confirming report No. 28 of the special master will be entered upon presentation.

July 11, 1934.

Memorandum on Rehearing.

WAY, District Judge.

After further consideration of these exceptions, I am still of opinion that the master's conclusions on this claim are correct and should be approved and confirmed.

1. As stated in the former memorandum filed by the court in this matter, the result of the arrangement made between the insurance company and the railway was to divide the amount of salary or wages due an employee of the railway for a given period, and to make the rail-

way debtor to the insurance company instead of the employee, for a designated part or percentage of that amount. The transaction did not operate to increase the funds in the hands of the railway company, but only as an equitable assignment to the insurance company of a part of the debt due from the railway to the employee. No money was paid to the railway by the employee and accepted as a special deposit, nor was any fund otherwise earmarked or set aside for the insurance company. The full amount originally due the employee was not impressed with any trust, express or implied, that could follow and impress itself upon the part for which, under the contract, the railway company became debtor to the insurance company, and there is a total want of any element of wrongdoing connected with the case. It seems to me, therefore, that the decision of the Supreme Court in Jennings v. United States F. & G. Co. (1935) 294 U.S. 216, 55 S.Ct. 394, 79 L.Ed. 869, 99 A.L.R. 1248, is in point. In headnote 6 of the official report of that case, it is said: "A national bank in Indiana became insolvent after collecting a check by a local clearing wherein the check was set off against checks of greater amount owed by the bank itself. Held that in the absence of wrongdoing, there is no ground for impressing the bank's assets with a constructive trust in favor of its principal; and neither is there ground for an implied trust, since the money proceeds of the transaction did not come into the bank as an identifiable fund but merely went to reduce its liabilities, and to infer that a trust was transferred from the proceeds to an equivalent portion of the bank's cash resources would be without warrant in the intention of the parties." See, also, Old Company's Lehigh v. Meeker, 294 U.S. 227, 55 S.Ct. 392, 79 L.Ed. 876.

2. As stated in the former memorandum, there is an absence of any special or unusual circumstances to take the case out of the six months' rule, assuming that the insurance company stands in the shoes of the railway's employees whom it insured and possesses all the rights which they would now have if they still owned the debts which it now asserts.

▇▇ The mere giving of a check intended to pay a debt which at the time the check was made and delivered was more than six months old would hardly be sufficient to create special equities in the claimant's favor sufficiently strong to take the debt out of the six months' rule. There is an absence of evidence tending to show that the giving of the check caused the claimant to change its position to its injury, or that it could have taken any successful action to collect the debt between the time the check was delivered and receivers were appointed had the check not been given. In the absence of special equities in its favor, a debt more than six months old at the time of the appointment of receivers will not be allowed priority. Dictaphone Sales Corporation v. Powell et al., Receivers (C.C.A.4) 77 F.(2d) 795, 797.

September 13, 1935.

Affirmed by the Circuit Court of Appeals for the Fourth Circuit on April 6, 1936, in case styled Continental Casualty Co. v. Legh R. Powell, Jr., and Henry W. Anderson, Receivers of the Seaboard Air Line Railway Company, et al., 83 F.(2d) 652.

## V. In the Matter of the Claims of H. E. Gibbons and Others.

Claims by H. E. Gibbons, R. J. McCreary Lumber Company, and Maintenance Equipment Company v. L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company. Upon the appointment of such receivers on December 23, 1930, claimants filed their claims for materials and services which accrued more than six months prior to the receivership, which claims were referred to a special master, who heard testimony and made a finding that the claims having accrued more than six months prior to the receivership were not entitled to priority of payment. Exceptions were filed by claimants, and upon hearing thereof said claims were re-referred to the special master to ascertain and report if there were special equities justifying the granting of priority, although the claims accrued more than six months prior to the receivership. Claimants contended that the action of the railway company in delivering drafts to the claimants a few days before the appointment of receivers, which drafts were not paid because of intervention of the receivership, operated as equitable assignments pro tanto and established special equities in favor of the claims which the drafts covered. The special master again made a finding and reported to the court that there were no

special equities entitling the claims to priority. Upon hearing of exceptions filed by claimants to the second report of the special master. Affirmed.

Special Master's Report No. 97 in the Matter of the Claims Listed in Class 18.

I beg leave to file the following report in regard to the claims listed in class 18:

This class, in the various tables, contains claims for materials and services which accrued more than six months prior to the receivership. Some of these claims have already been disposed of by me in considering claims of claimants having items listed in other classes. The following are the claims in this class which have not up to the present time been disposed of: (list omitted.)

I have hitherto uniformly held that any claim for items furnished prior to the six months' period was not entitled to priority. I make the same report in regard to all the foregoing. The most recent utterance of the Supreme Court upon this point is that contained in St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, at pages 310, 311, 47 S.Ct. 635, 637, 71 L.Ed. 1060. There the court had this to say in regard to a contention that claims incurred prior to the six months' period were entitled to priority (I have italicized the language which is applicable here): "Spiller contends that he was entitled to preferential payment of his judgment for the excess charges, out of operating income accruing during the receivership, on the doctrine of Fosdick v. Schall, 99 U.S. 235, 251–255, 25 L.Ed. 339. See New York Dock Co. v. S. S. 'Poznan,' 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955. It is argued that the test of this equity is the nature of the claim; that a liability for excess charges unlawfully exacted by the carrier before the receivership is an expense of operation like a debt incurred for labor, supplies, equipment or improvements; and that, as such, it is entitled to priority over bondholders. *We need not determine whether the noncontractual claim here in suit is in its nature within the class of debts entitled to preferential payment under the doctrine of Fosdick v. Schall. For, by long established practice, the doctrine has been applied only to unpaid expenses incurred within six months prior to the appointment of the receivers.* See Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U.S. 298, 316, 20 S.Ct. 363, 44 L.Ed. 475. Compare Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717. The cases in which this time limit was not observed are few in number and exceptional in character."

In face of such language as this it would surely be improper for a special master to give priority to any claim of this character. If, in any particular case, this should be done, it should be done by the court. I know of no special equities which would take any of these claimants out of the ordinary rule.

Special Master's Report No. 112.

On November 9, 1934, the court referred back to me certain claims, or parts of claim, as follows: * * *

(3) The claim of H. E. Gibbons for $4,094.81, special master's report No. 97.

(4) The claim of the R. J. McCreary Lumber Company for $2,006.57, special master's report No. 97.

(5) The claim of the Maintenance Equipment Company for $428.10, special master's report No. 97.

The questions which I was directed to ascertain and report in regard to each claim were:

(a) The nature and consideration of the claim.

(b) Whether or not the claimant made reasonable efforts to collect the same prior to the appointment of receivers.

(c) Whether or not the Seaboard Air Line Railway Company, prior to the appointment of receivers, mailed or delivered to the claimant a draft, or drafts, covering said items, and, if so, whether or not said drafts were promptly deposited and forwarded for collection.

(d) Whether the claimant would be entitled to priority as to said portions of its claim had the same accrued after June 23, 1930, and whether or not there are any special circumstances entitling it to priority, notwithstanding the fact that said portions of the claim accrued on or prior to said date.

A hearing was had before me at my office on April 16, 1935, in regard to the matters so referred back to me, at which the various claimants were represented by counsel, and the questions involved argued at length, both orally, and upon written briefs.

Taking up the claims in order, I beg to report as follows: * * *

### III. H. E. Gibbons.

(a) The nature and consideration of this claim is stated as follows in a stipulation entered into by all the parties in interest:

The railway company is indebted to the claimant in the sum of $4,094.81, for lumber and piling furnished by the claimant to the railway company between May 3, 1930, and June 20, 1930. The materials furnished were of a character suitable for construction and also suitable for operating purposes, and the quantity purchased within the period mentioned was normal. There is nothing in the files or correspondence of the railway company to indicate for what purposes the materials were to be used, and the circumstances under which they were purchased did not indicate to the claimant the purposes for which they were to be used. The materials furnished are covered by twenty-eight separate invoices, as shown in paragraph 4, infra. Of those twenty-eight items, the use of the materials covered by six items is unknown. These were commingled with the general stores of the railway company and charged to the stock account. The materials covered in nineteen items were used for maintenance and charged to operations. The materials covered by the last three items as shown below were used in connection with the construction of new water facilities. * * *

(b) There is no question that the claimant did make reasonable efforts, prior to the appointment of receivers, to collect the above sum of $4,094.81. * * *

(c) The Seaboard Air Line Railway Company did, prior to the appointment of the receivers, mail to the claimant drafts covering the items making up the said sum of $4,094.81, and these drafts were promptly deposited by the claimant and forwarded for collection. * * *

(d) As will be noted, this claim embraces twenty-eight separate items. It appears that the use of the materials covered by six items is unknown. It also appears that the claimant did not know, when the materials were furnished, whether they were to be used for operating purposes or for construction work. They were not sold with the understanding on claimant's part that they were to be used for operating purposes. I held, in report No. 32, which has been confirmed by the court, that, in the case of one claiming priority for materials furnished, it was essential, if the seller did not know whether the materials were to be used for the one purpose or the other, that they should actually have been used for operating purposes, in order that the seller might be entitled to priority. As to these items, therefore, the claimant is not entitled to priority. It will be further noted that the materials covered by the last three items of the claim were used in connection with the construction of new water facilities at Maxwelbourn, Ala. This was a new project, so that these materials are not entitled to priority. The remaining nineteen items were used for maintenance and charged to operating, and would, therefore, be entitled to priority if the materials had been furnished within six months prior to the receivership. What I have said in regard to the claim of Woodstock Slag Corporation applies here. Unless the six months' rule is to be abandoned, this claimant is not entitled to priority. I do not think that the rule should be extended by one, two, or three days any more than that it should be extended by one, two, or three months. It is unfortunate, of course, that the drafts given the claimant were not paid, but as I have pointed out in the case of the Woodstock Slag Corporation, at the time these drafts were issued, the six months' period had expired. I take it that the six months' rule means that any claimant dealing with a railway company does so with knowledge of the fact that, if a receivership should intervene six months after his claim has arisen, he will be shut out.

### IV. R. J. McCreary Lumber Company.

(a) The nature and consideration of this claim is stated as follows in a stipulation entered into by all the parties in interest:

The railway company is indebted to the claimant in the sum of $2,006.57, for pine lumber furnished by the claimant to the railway company between April 3, 1930, and June 6, 1930. The materials furnished were of a character suitable for construction and also suitable for operating purposes, and the quantity purchased within the period mentioned was normal. There is nothing in the files or correspondence of the railway company to indicate for what purposes the materials were to be used, and the circumstances under

which they were purchased did not indicate to the claimant the purposes for which they were to be used. The use actually made of said materials is unknown. They were commingled with the general stores of the railway company and were charged by the railway company to the stock account.

(b) There is no question that the claimant did make reasonable efforts, prior to the appointment of receivers, to collect the above sum of $2,006.57. * * *

(c) The Seaboard Air Line Railway Company did, prior to the appointment of the receivers, mail to the claimant drafts covering the items making up the said sum of $2,006.57, and these drafts were promptly deposited by the claimant and forwarded for collection. * * *

(d) As the foregoing materials were not sold or supplied specifically for operating purposes, and as it is not known what use was actually made of them, I hold, in accordance with report No. 32, hitherto filed by me and confirmed by the court, that this claimant would not be entitled to priority, even if he were within the six months' rule.

V. Maintenance Equipment Company.

(a) The nature and consideration of this claim is stated as follows in a stipulation entered into by all the parties in interest:

The railway company is indebted to the claimant ·in the sum of $428.10, made up of the following items:

(a) $23.10 represents the purchase price of six switch protectors purchased on April 23, 1930, used by the railway company in maintenance, and charged to operations.

(b) $405 represents the purchase price of three Breyley friction car stops purchased by the railway company on May 22, 1930.

These materials were of a character suitable for. construction and also suitable for operating purposes. They were purchased under circumstances which did not indicate to the claimant whether they were to be used for operations or construction, and there is nothing in the files or correspondence of the railway company to show that the claimant was advised for what purpose they were purchased. * * *

There is no question that the claimant did make reasonable efforts, prior to the appointment of the receivers, to collect the above sum of $428.10. * * *

(c) The Seaboard Air Line Railway Company did, prior to the appointment of receivers, mail to the claimant drafts covering the items making up the said sum of $428.10, and these drafts were promptly deposited by the claimant and forwarded for collection. * * *

(d) It appears that the six switch protectors which represent $23.10 of this claim were used in maintenance, and charged to operations. The claimant would, therefore, to the extent of $23.10, be entitled to priority, if they had been furnished within six months prior to the receivership. The remainder of the claim, $405, represents three friction car stops which were purchased under circumstances which did not intimate whether ·they would be used for operation or construction but which were in fact used in connection with modernizing a project at Hamlet, N. C., which included the construction of a new freight depot, transfer shed, paving, construction of water supplies, flood light, new transfer tracks, cross-overs, leads, etc., and rearrangement of electric lines and existing tracks; the said friction car stops not having replaced any like articles which had previously been installed. This was all plainly construction work, so that the item of $405 would not be entitled to priority even if it were within the six months' period.

It was further urged, with great earnestness and ability, that the drawing and delivery of the drafts in question under the circumstances shown by the stipulations constituted an equitable assignment pro tanto as between the railway company and the respective claimants.

In support of this contention, Mr. Willcox relies on Federal Reserve Bank v. Peters, 139 Va. 45, 123 S.E. 379, 42 A.L.R. 742. This case I shall examine later. Mr. Willcox very frankly admits that the great weight of authority is to the effect that the delivery of a check or draft is not an assignment pro tanto. At the same time he states that the authorities examined by him universally hold that, where the evidence indicates an intention on the part of a drawer to segregate a fund for the benefit of the drawee, a check or draft will be considered an equitable assignment pro tanto, and enforced against receivers, assignees, and personal representatives.

I think that these are correct statements of the law, and, if there were any evidence of the segregation of a fund

by the railway company for the benefit of the parties in whose favor these drafts were drawn, it might well be argued that there had been an assignment pro tanto of such funds. But, as I see it, there has been no segregation whatever. The railway company simply gave to the various claimants drafts on its treasurer, some of which were taken to the banks and collected before the receivership, while the others were presented too late. It was the custom, as set forth in the stipulation, to have these drafts, drawn on the treasurer of the railway company and stated to be payable at various banks, issued to the creditors of the railway company. Up until the receivership, these banks, having no doubt whatever as to the prompt payment of the drafts by the treasurer of the railway company, had accepted and given cash or credit for them. As just stated, they were not drawn on the banks, but were drawn on the railway company's treasurer. However, for the purposes of this report, they may be treated as though they had been drawn on the banks. Even so, they would not have been assignments. No fund had been set apart out of which they were to be paid. They differed in no respect from any other draft or checks save that they were not addressed to a third party, but to the officer of the drawer. *They were drawn in New York,* and were payable either at the Chase National Bank of New York, or at banks in Norfolk or Portsmouth, Va. In both New York and Virginia the Negotiable Instruments Act had been adopted. That act expressly provides that neither a draft nor a check shall be considered as an assignment. Code of 1930, §§ 5689, 5751. This ought to be decisive of the question.

But Mr. Willcox is of the opinion that, notwithstanding the act, the above-mentioned case of Federal Reserve Bank v. Peters, 139 Va. 45, 123 S.E. 379, 42 A.L.R. 742, had held that a check or draft does constitute an assignment. There is language in the opinion of the court which, considered apart from the facts of the case, would justify this conclusion; but the language of every opinion is to be read in the light of the facts of the case with which it deals, and the concluding paragraph (139 Va. 45, at page 69, 123 S.E. 379, 42 A.L.R. 742) of the opinion in the Peters Case (which is the language relied on), while it does state that a check is an assignment pro tanto as between drawer and drawee, uses this language in dealing

with a situation where a trust had been created and there *had been a segregation.* In that case, the Federal Reserve Bank had sent to the Prince Edward-Lunenburg County Bank certain checks and drafts drawn upon itself (Prince Edward-Lunenburg County Bank), with the express understanding that the latter bank would remit the proceeds either by a shipment of currency or money, or by means of a draft drawn upon some other bank with which it had funds on deposit. Under this arrangement the two banks had done business for some time. The drawers of the checks or drafts had the money in the Prince Edward-Lunenburg County Bank to make the checks or drafts good, and this bank, upon receiving them, charged against the drawers' accounts the amounts thereof. It thereupon, pursuant to the foregoing arrangement, at once drew in favor of the Federal Reserve Bank a draft on the Bank of Commerce & Trusts of Richmond for the aggregate of the said drafts, having to its credit at that time on deposit with the Bank of Commerce & Trusts nearly five times the aggregate of the checks and drafts which had been forwarded to it by the Federal Reserve Bank. This draft was received by the Federal Reserve Bank in due course and presented to the Bank of Commerce and Trusts. Payment was refused because, between the drawing and the presentation of the draft, a receiver had been appointed for the Prince Edward-Lunenburg Bank. The question involved in the case was whether the receiver was entitled to the entire fund in the Bank of Commerce & Trusts, or whether, under the circumstances, the drawing of the draft was an assignment pro tanto of that fund to the Federal Reserve Bank. The court held that there had been an assignment pro tanto, for the following reasons (139 Va. 45, at page 57, 123 S.E. 379, 382, 42 A.L.R. 742):

"It appears," said the court, "from the record that as soon as the draft was sent to the Federal Reserve Bank of Richmond the cashier of the Prince Edward-Lunenburg County Bank deducted the amount thereof from the apparent balance due from the Bank of Commerce & Trusts upon which the draft was drawn, just as if this amount had already been withdrawn from the latter bank and transferred to the Federal Reserve Bank of Richmond. By this act the cashier intended to set apart such a portion of the balance in the Bank of Commerce &

Trusts as was necessary to meet the draft sent to the Federal Reserve Bank of Richmond, as he was obligated to do under his contract.

"Equity regards that as done which ought to have been done. Under such circumstances the draft on the Bank of Commerce & Trusts was an equitable assignment of the funds to the Federal Reserve Bank of Richmond, and we will so adjudge."

Now it will be observed that, prior to the drawing of the draft on the Bank of Commerce and Trusts, a situation had been created whereby the drawer bank was properly held to have become a trustee of a designated fund for the Federal Reserve Bank. It had, in effect, collected from the drawers of the various checks and drafts which had been sent to it the amounts of those drafts. It is true that this was a bookkeeping operation, but, nevertheless, the creation and segregation of a genuine trust fund can be found to have been brought about. Accordingly, when the Prince Edward-Lunenburg County Bank sent to the Federal Reserve Bank its draft on the Bank of Commerce and Trusts, it might well be held that this was intended to constitute, and did constitute, an assignment of that segregated fund. While the language of Judge West (139 Va. 45, at page 69, 123 S.E. 379, 42 A.L.R. 742), to which reference has already been made, is not, I respectfully submit, a correct statement of the law, and is in direct contradiction of the Negotiable Instruments Act, it was a true statement of the legal effect of the particular circumstances of that particular case. It is upon the theory of the creation and segregation of a trust fund that Professor Lyle, in section 208 of his edition of Bigelow on Checks and Notes, approves the decision in the Peters Case. He plainly says that a check is *not* an assignment, but goes on to say that, inasmuch as a trust had been created by the Prince Edward-Lunenburg County Bank in favor of the Federal Reserve Bank by the collection of the checks and drafts sent to the former by the latter, the draft on the Bank of Commerce and Trusts constituted an assignment of this trust fund.

The case of Webb v. O'Geary, 145 Va. 356, 133 S.E. 568, is to the same effect. In this case also there was a trust fund, and the holding of the court was to the effect that this particular fund had been assigned.

It is not difficult, in such cases as these, to work out an assignment. But you cannot have an assignment unless you have, in some way, set aside a fund to be assigned. There must be a res to be assigned. Where you have no res, that is to say, no fund, but simply a debtor and creditor relation, an order by a creditor upon his debtor cannot become and operate as an assignment. The creditor's claim against his debtor is in personam and not in rem. He has no claim against or interest in any specific property, and therefore has nothing to assign. He can request his debtor to act, but that is all. Had the railway company set aside a particular fund in some particular bank or banks, and notified these various claimants that this fund had been put in the respective banks for their benefit, and had then given them checks upon it, a different situation would have been presented. But nothing of the sort has happened. We do not even have an order upon a bank, but simply a direction by the railway company to its treasurer to honor certain drafts, which direction could not be carried into effect before the receivership took place.

In the case of Federal Reserve Bank v. Bohannan, 141 Va. 285, 127 S.E. 161, Judge Burks regards the decision in the Peters Case as simply the creation of a trust by the drawer bank in favor of the Federal Reserve Bank. Apparently he ignores altogether the assignment feature. Unquestionably, the case could be rested upon this ground.

That Judge West was in error in his statement as to the effect of a check, where no special circumstances amounting to a segregation exist, is not only plain from the express wording of the Negotiable Instruments Act, but also runs counter to the decisions of the Supreme Court of Appeals in the cases of Baltimore & Ohio R. Co. v. First National Bank, 102 Va. 753, 47 S.E. 837, and Jones v. Crumpler, 119 Va. 143, 89 S.E. 232. The latter case is directly in point, having a contest between an attaching creditor and the holder of a draft, in which it was held that the attaching creditor took the fund rather than the holder of the draft—and this because a draft is not an assignment. To

the same effect is Gardner v. Moore, 122 Va. 10, 94 S.E. 162.

I return herewith as a part of this report all of the stipulations above referred to.

Special Master's Report No. 97 and No. 112 as They Relate to the Claims of H. E. Gibbons, R. J. McCreary Lumber Company, Maintenance Equipment Company, and others. (Claims of Woodstock Slag Corporation and Pintsch Compressing Company are Not Covered by this Memorandum.)

WAY, District Judge.

I am of the opinion that these reports should be approved and confirmed.

The principal exceptions are addressed to the action of the master in holding that the drafts, given by the railway shortly prior to the appointment of receivers, did not operate as assignments or establish special equities in favor of the claims which the drafts covered.

After mature consideration of these exceptions, I am of the opinion that the master's conclusions are correct. The evidence signally fails to establish any facts which would justify the conclusion that the drafts operated as assignments of any particular fund or funds.

An examination of the stipulations discloses that in no instance now under consideration was a draft delivered to claimant until after the claim, which the draft was given to cover, was more than six months old. In other words, in each of the instant claims where a draft was given the claim which it covered had, under the six months' rule, already become stale. The court has held in the case of the Pintsch Compressing Company that the delivery of a draft of the claimant and depositing it for collection in due course, *before* the claim had become six months old and where nothing further in connection with payment of the claim remained to be done by either the railway or the claimant, are circumstances which establish a special equity in favor of such claim. However, as already stated, all of the drafts covering the claims now under consideration were delivered *after* the expiration of the six months' period which immediately followed the accrual of the claims. The facts that the drafts were delivered within the six months immediately preceding the appointment of receivers is not especially material, since such delivery did not occur until after the claims the drafts covered had become stale.

An order in conformity with these conclusions will be entered upon presentation.

September 18, 1935.

VI. In the Matter of the Claim of the Pintsch Compressing Company.

Claim by Pintsch Compressing Company v. L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company. Said receivers were appointed December 23, 1930, and thereafter claimant filed its claim for materials, which claim was referred to a special master, who found that that portion which accrued within six months prior to appointment of receivers was entitled to priority of payment and that the portion accruing more than six months before appointment of receivers was not so entitled. Upon hearing of exceptions filed to such findings of the special master, said claims were re-referred to the special master, who found that there were no special equities to take the claim out of the six months' rule. Claimant contended that action of the railway company in delivering drafts to the claimant a few days prior to the receivership, which drafts were not paid because of intervention of the receivership, operated as equitable assignments pro tanto and established special equities in favor of claimant entitling it to priority of payment. Upon hearing of exceptions filed by claimant to the second report of the special master. Modified and affirmed.

Special Master's Report No. 62 in the Matter of the Claim of the Pintsch Compressing Company.

I beg leave to file the following report in regard to the claim of the Pintsch Compressing Company:

The facts in regard to this claim are set forth in a stipulation agreed to by all parties which is attached hereto and made a part hereof. The total indebtedness of the railway company to the claimant is $1,353.80.

(1) Of this amount, $845.04 has already been reported entitled to priority in my report No. 1.

(2) Of this balance, $341.61 represents the purchase price of materials and supplies furnished by claimant to the railway company prior to June 24, 1930, and for this reason is not entitled to priority.

(3) The balance, $167.15, represents rental due by the railway company for the use of storeholders between June 23, 1930, and December 24, 1930.

Rental claims are not preferential claims, and so I report that this item is not entitled to priority.

Special Master's Report No. 112.

On November 9, 1934, the court referred back to me certain claims, or parts of claims, as follows: * * *

(2) That portion of the claim of the Pintsch Compressing Company, special master's report No. 72, aggregating the sum of $341.61, as to which priority was denied because it accrued on or before June 23, 1930. * * *

The questions which I was directed to ascertain and report in regard to each claim were:

(a) The nature and consideration of the claim.

(b) Whether or not the claimant made reasonable efforts to collect the same prior to the appointment of Receivers.

(c) Whether or not the Seaboard Air Line Railway Company, prior to the appointment of receivers, mailed or delivered to the claimant a draft, or drafts, covering said items, and, if so, whether or not said drafts were promptly deposited and forwarded for collection.

(d) Whether the claimant would be entitled to priority as to said portions of its claim had the same accrued after June 23, 1930, and whether or not there are any special circumstances entitling it to priority, notwithstanding the fact that said portions of the claim accrued on or prior to said date.

A hearing was had before me at my office on April 16, 1935, in regard to the matters so referred back to me, at which the various claimants were represented by counsel, and the questions involved argued at length, both orally, and upon written briefs.

Taking up the claims in order, I beg to report as follows: * * *

II. Pintsch Compressing Company.

(a) The nature and consideration of this claim is stated as follows in a stipulation entered into by all the parties in interest:

The railway company is indebted to the claimant in the sum of $340.61 for illuminating gas furnished by the claim-ant to the railway company in two items; the first on May 31, 1930, in the amount of $194.13, and the second on June 23, 1930, in the amount of $146.48. The cost of said gas was charged by the railway company to operating expense, and the entire amount would be entitled to priority had it accrued after June 24, 1930.

(b) There is no question that the claimant did make reasonable efforts, prior to the appointment of receivers, to collect the above sum of $340.61. This plainly appears from paragraph 3 of the above stipulation, which reads as follows: The claimant never entered suit for the collection of said claim, or any part thereof, prior to the appointment of receivers, but it did make frequent and repeated demands on the railway company for payment, without success.

(c) The Seaboard Air Line Railway Company did, prior to the appointment of the receivers, mail to the claimant drafts covering the items making up the said sum of $340.61, and these drafts were promptly deposited by the claimant and forwarded for collection. This, too, is plainly set forth in paragraphs 4 and 5 of the foregoing stipulation, which are as follows:

In an attempted settlement of the above items, on December 20, 1930, the railway company mailed to the claimant drafts covering said invoices as follows:

| Date of Invoice | Date of Draft | Amount of Draft |
|---|---|---|
| 5–31–30 | 12–20–30 | $194.13 |
| 6–23–30 | 12–20–30 | 146.48 |
| | | $340.61 |

Said drafts were drawn on the treasurer of the railway company and by information stamped on each of them were made payable at the American National Bank of Portsmouth, Va., or the Norfolk National Bank of Commerce and Trusts, Norfolk, Va.

Everything contained in paragraphs 5, 6, 7, 8, 9, and 10 of a stipulation dated April 5, 1935, between the Woodstock Slag Corporation, the railway company, and the trustees is incorporated herein by reference, save and except that in this instance the drafts were mailed to the claimant at its home office in New York, and deposited by it in its local bank.

(d) It appears from the foregoing that the indebtedness of $340.61 due the claimant was the purchase price of certain

illuminating gas furnished to the railway company by the claimant in two items, the first on May 31, 1930, in the amount of $194.13, and the second on June 23, 1930, in the amount of $146.48, and that this gas was used for operating purposes. The item in question would, therefore, be entitled to priority if the gas had been furnished within six months prior to the receivership. I need only repeat here the views which I have just expressed in regard to the claim of the Woodstock Slag Corporation as not justifying a relaxation of the six months' rule in this case. * * *

**Special Master's Report No. 62 and That Part of Report No. 112 Relating to the Claim of Pintsch Compressing Company.**

WAY, District Judge.

1. As to the item of $146.48 covered by invoice dated June 23, 1930, it seems to me that the master's report may very well be modified, for the following reasons: If we count the date which that invoice bears, namely, June 23, 1930, the six months immediately following June 23, 1930, did not expire until December 22, 1930, the day before the receivers were appointed.

█ On December 20, 1930, two days before the expiration of the aforesaid six months' period following the accrual of the item of $146.48, the railway delivered a draft to claimant covering that item which was thereafter deposited for collection. Therefore, the railway, in the ordinary and usual course of transacting business, had done all that it could do towards the payment of that item. It, therefore, does not seem to me that this item comes within the reasons for the rule laid down in Dictaphone Sales Corporation v. Powell (C.C.A.) 77 F.(2d) 795, 797, and the decisions there quoted. Neither the railway nor the claimant expressly or impliedly approved any extension of the time of payment of this item beyond the expiration of the time usually allowed by equity, but, on the contrary, within the six months immediately following the accrual of that item the railway and claimant did all that they could do in ordinary course to complete payment; the item was in fact conditionally paid before it became six months old, and except for the sudden intervention of the receivership such

conditional payment would have become final without any further action by either the Railway or the claimant. This ruling does not operate to revive a stale claim, but merely gives effect to acts of the Railway and claimant all of which occurred before the claim could become stale.

Report No. 62 will be modified to the extent above noted and, as modified, approved and confirmed.

September 18, 1935.

VII. In the Matter of the Claim of Woodstock Slag Corporation.

Claim by Woodstock Slag Corporation v. L. R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company. Said receivers were appointed December 23, 1930, and thereafter claimant filed its claim for materials, which claim was referred to a special master, who found that that portion which accrued within six months prior to appointment of receivers was entitled to priority of payment and that the portion accruing more than six months before appointment of receivers was not so entitled. Upon hearing of exceptions filed to such findings of the special master, said claims were re-referred to the special master, who found that there were no special equities to take the claim out of the six months' rule. Claimant contended that action of the railway company in delivering drafts to the claimant a few days prior to the receivership, which drafts were not paid because of intervention of the receivership, operated as equitable assignments pro tanto and established special equities in favor of claimant entitling it to priority of payment. Upon hearing of exceptions filed by claimant to the second report of the special master. Affirmed.

**Special Master's Report No. 33 in the Matter of the Claim of the Woodstock Slag Corporation.**

I beg leave to file the following report in regard to the claim of Woodstock Slag Corporation:

The facts in regard to this claim have been set forth in a stipulation agreed to by all parties which is filed herewith and made a part hereof. It appears that the total indebtedness of the railway company to the claimant is $16,438.55.

(1) Of the foregoing, the sum of $17.-94 represents protest fees on vouchers is-

sued by the railway company to the claimant immediately prior to the receivership, which were not honored, and therefore protested because of the receivership. It is not disputed that this is a just indebtedness, but I hold that it is not entitled to priority.

(2) Of the balance, the sum of $1,252.51 has already been allowed as a priority claim in my report No. 1.

(3) Of the remainder, the sum of $4,796.13 represents the purchase price of materials and supplies furnished to the railway company more than six months prior to the receivership. For this reason, I hold that this item is not entitled to priority. But, of this amount, $316.73 represents the purchase price of seven cars of ballast which were loaded f. o. b. cars furnished by the railway company on June 18 and June 19, 1930. These cars moved on the railway company's lines prior to June 23, 1930, but were not unloaded until June 24, 25, and 26, 1930. Inasmuch as this particular item accrued within such a short period prior to June 23, 1930, I feel that, although I do not allow it priority, I should call it to the court's attention.

(4) The entire balance of $10,371.97 represents the purchase price of slag ballast furnished within six months prior to the receivership. This ballast was placed upon the Georgia Division of the railway company's line, and delivery of the same was made at the points shown by the schedule attached to the stipulation of facts, marked "Exhibit A." I have already had occasion to consider the nature of those ballast supplies in dealing with the claims of W. R. Bonsal & Company and others, and have reached the conclusion that they were ordinary maintenance items, and entitled to priority.

Reference is made to the testimony of Mr. W. D. Simpson, assistant engineer of maintenance of way, filed with the report in the case of W. R. Bonsal & Company, in regard to these supplies. I also refer to the case of Southern Railway Company v. Carnegie Steel Company, 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458.

I accordingly report that this item of $10,371.97 is entitled to priority.

As to those items which I have reported entitled to priority, no finding is made at this time as to whether or not the same should bear interest, or, if so, during what period.

No finding is now made as to what funds and/or property coming into the hands of the receivers are subject to, or available for, the payment of the said items.

Special Master's Report No. 112.

On November 9, 1934, the court referred back to me certain claims, or parts of claims, as follows:

(1) That portion of the claim of the Woodstock Slag Corporation, special master's report No. 33, aggregating the sum of $4,796.13, as to which priority was denied because it accrued on or before June 23, 1930. * * *

The questions which I was directed to ascertain and report in regard to each claim were:

(a) The nature and consideration of the claim.

(b) Whether or not the claimant made reasonable efforts to collect the same prior to the appointment of Receivers.

(c) Whether or not the Seaboard Air Line Railway Company, prior to the appointment of receivers, mailed or delivered to the claimant a draft, or drafts, covering said items, and, if so, whether or not said drafts were promptly deposited and forwarded for collection.

(d) Whether the claimant would be entitled to priority as to said portions of its claim had the same accrued after June 23, 1930, and whether or not there are any special circumstances entitling it to priority, notwithstanding the fact that said portions of the claim accrued on or prior to said date.

A hearing was had before me at my office on April 16, 1935, in regard to the matters so referred back to me, at which the various claimants were represented by counsel, and the questions involved argued at length, both orally and upon written briefs.

Taking up the claims in order, I beg to report as follows:

I. Woodstock Slag Corporation.

(a) The nature and consideration of this claim is stated as follows in a stipulation entered into by all the parties in interest: The railway company is indebted to the claimant in the sum of $4,796.13, representing the cost of slag ballast purchased by the railway company and used on various portions of the Georgia Divi-

sion of the main line. * * * In the opinion of the proper officials of the railway company the ballast was absolutely necessary for the purpose of remedying this condition and was used to replace existing ballast which had become sunk. It was necessary periodically, in order to keep the track smooth, to raise it, and when this was done additional ballast had to be placed under and around the ties to support the track. All of said ballast was purchased between March 10, 1930, and June 18, 1930. * * *

(b) There is no question that the claimant did make reasonable efforts, prior to the appointment of receivers, to collect the above sum of $4,796.13. * * *

(c) The Seaboard Air Line Railway Company did, prior to the appointment of the receivers, mail to the claimant drafts covering the items making up the said sum of $4,796.13, and these drafts were promptly deposited by the claimant and forwarded for collection. * * *

6. The claimant received each of said drafts in due course and promptly deposited the same in its local bank for collection. They were forwarded through the usual banking channels and in due course were presented to the banks at which they were payable and payment demanded. Before any of such drafts reached the bank at which it was payable, the receivers had been appointed, the banks had received information or notice of the appointment and had transferred the funds on deposit to the account of the receivers, and said banks refused payment and protested said drafts and returned them, with protest charges added.

(d) For the reasons set forth in report No. 32, dealing with the claims of W. R. Bonsal & Co.. et al., I am of the opinion that this claim covers ordinary maintenance items, and that, but for the six months' rule, it would be entitled to priority.

I am of the opinion that there are no special circumstances which should take this claim out of the six months' rule. It is true that, if the receivership had not intervened, the drafts mailed to claimant would have been paid. But none of these drafts was mailed prior to December 20, 1930, at which time the six months' period had expired as to all the items making up the claim. So that, at that time, claimant had no standing as a six months' creditor, and its status was in no way af-

fected by the giving of the draft, or by its nonpayment. I do not mean by this to intimate that, if the six months' period had not expired at that time, the result would be different, for that question is not before me.

It seems to me that the Supreme Court, in the case of St. Louis & S. F. R. Co. v. Spiller, 274 U.S. 304, 47 S.Ct. 635, 71 L.Ed. 1060, has very plainly put the stamp of its approval upon the six months' rule. It says (274 U.S. 304, at page 311, 47 S.Ct. 635, 71 L.Ed. 1060) that this rule has been established by long practice, and that the cases in which it has not been followed have been few in number and exceptional in character. While it is unfortunate that the receivership prevented the payment of the drafts which had been mailed to claimant, this fact does not, in my opinion, constitute a special circumstance entitling the claim to priority. The claim was simply not paid, and that was all. This is of course true of all claims, otherwise entitled to priority, but excluded by the rule in question.

In the case of Pennsylvania Steel Company v. New York City R. Co. (D.C.) 229 F. 465, 467, the special master, it seems, disallowed no claim on the ground that it was barred by the six months' rule. Some of the claims allowed by him had accrued more than nine months prior to the receivership. Exceptions were taken to his allowance of any claim which had accrued more than six months prior thereto. Circuit Judge Lacombe, acting as District Judge, overruled the exceptions, and allowed the claims. In doing so, he said: "One proposition, however, is settled by repeated decisions of the United States Supreme Court, viz.: That special circumstances will justify the allowance of claims accruing earlier than the arbitrary period generally settled upon."

He then went on to hold that special circumstances did exist in that case in reference to the claims under advisement, in this, that one of the type claims accruing more than six months before the receivership had been allowed not only by the special master, but also by the District Court, and then by the Circuit Court of Appeals. Although he pointed out that the claim was a small one, and might well have escaped the attention of the Circuit Court of Appeals, which had made no reference whatever to it, and although he admitted that, for this reason, the decision of that court was not authority upon the

point one way or the other, he nevertheless held that the treatment of all the receivership claims should be uniform, and that, for this reason, the exceptions to the claim in question should be overruled. He added, further, that the amount of the claims accruing prior to the six months' period was relatively small.

It will be observed that Judge Lacombe was dealing with a very different situation from that which is presented here. In the present case, the special master has not allowed any claims which accrued prior to the six months' period; he has rigorously, in all instances, held that such claims were not entitled to priority. Moreover, it will be noted that Judge Lacombe was unusually apologetic for his action, and that he was eager to bring forward every possible justification for it that occurred to him. His decision was handed down in 1915, more than twelve years prior to the decision of the Supreme Court in the Spiller Case. In the meantime the six months' rule has been consistently adhered to, so far as I am informed, by the federal courts, and this adherence has met with the approval of the Supreme Court. As I have already stated, there is no peculiarity about this present claim which distinguishes it from other claims. It would have been entitled to priority had it been within time, but not more so than any other claim for a current expense. It is true that the claimant was active in pressing for its payment, but, unfortunately, the receivership did not take place until after the six months had expired. I think that, if the circumstances existing in this instance were to be held sufficient to set aside the rule, the rule would lose all its effectiveness, for, unquestionably, every claimant would be able to show that he had exercised reasonable diligence to collect his claim prior to the receivership. * * *

On Exceptions to Report No. 33 and to that Part of Report No. 112 Which Refers to the Claim of Woodstock Slag Corporation.

WAY, District Judge.

█ 1. Referring to that part of this claim ($4,796.13) disallowed by the master because the materials which the amount represents were furnished more than six months prior to the appointment of receivers: As stated in the memorandum filed with respect to report No. 31, I am of the opinion that such claims to priority are controlled by the decision of our Circuit Court of Appeals in Dictaphone Sales Corporation v. Powell et al., Receivers, 77 F.(2d) 795, at 797. As a matter of fact, it would appear to be just as logical for the trustee to urge that a claim not quite six months old should be disallowed on account of its age, as for claimants to urge that one only a few days more than six months old should be allowed priority.

As pointed out by the master in report No. 112, the six months had expired at the time the drafts were mailed to claimant. This delivery did not cause claimant to change its position to its injury, nor could claimant, in the few days that intervened between the delivery of the drafts and the appointment of receivers, have taken successful steps to collect, had there been no delivery of the drafts.

█ 2. It appears from the master's report that other items which he allowed priority are for materials furnished and used in maintaining and repairing roadbed. These items amount to $10,371.97 and were very properly accorded priority.

An order approving and confirming report No. 33 and that part of No. 112 which relates to the claim of Woodstock Slag Corporation will be entered.

September 16, 1936.

VIII. In the Matter of the Claim of A. B. Floyd.

Upon hearing of exceptions filed by A. B. Floyd to special master's report No. 53 denying priority under the six months' rule to certain items of a claim for supplies filed by him with the receivers of the Seaboard Air Line Railway Company. The claim involved several items covering the purchase price of piles for construction work during the six months' period. The special master held that none of the items were entitled to priority under the six months' rule because the items involved new construction. In paragraph 2, item (b) of his report, the special master held:

"$459.00 represents the purchase price of cypress piles used in connection with the construction of a pile bent trestle at Hutchinson Island, Savannah, Georgia, to support the track over the dock on a pier at the Railway Company's terminals to prevent the weight of loaded cars sliding the dock into the slip, the gross cost of the project being $866.08.

"In my opinion the above mentioned pile bent trestle was new construction, and an entirely new project, precisely as an additional spur track would have been, and so the item in question is not entitled to priority."

Modified and affirmed.

WAY, District Judge.

1. The report of the master on the terms of $192.00 and $40.80 will be approved and confirmed.

2. With respect to the item for $459.-00 representing the purchase price of cypress piles used in the construction of a pile-bent trestle at Hutchinson Island, Savannah, Ga., "to support the track over the dock on a pier at the railway's terminals to prevent the weight of loaded cars from sliding the dock into the slip": The evidence with respect to this item is meager and not entirely clear. However, it seems to me that a fair construction of the language of the stipulation leads to the conclusion that this item was incurred as an operating expense to maintain an existing track and facility in a reasonably safe condition.

As pointed out by the master in numerous reports, many items are so close to the border line that it is almost impossible accurately to distinguish between "new construction" and expenditures necessary to maintain a railroad track or other facility in safe condition. Based on the language of the stipulation, however, it seems to me this item does not properly come under new construction but rather belongs under maintenance.

Report No. 53 accordingly will be modified, and as modified approved and confirmed.

September 17, 1935.